Peggy Sue SHEPHERD, Personally and as Administratrix of the Estate of George Shepherd, Deceased, *v.* WASHINGTON COUNTY, Arkansas, Sheriff Kenneth McKee, Personally and in His Official Capacity, and Deputy John Doe, Personally and in His Official Capacity,

97-530 962 S.W.2d 779

Supreme Court of Arkansas
Opinion delivered February 19, 1998

*Lisle Law Firm*, by: *Chris Lisle*, for appellant.

*Duncan & Rainwater*, by: *Robert A. Russell, Jr.*, for appellees.

DONALD L. CORBIN, Justice. Appellant Peggy Sue Shepherd, personally and as Administratrix of the Estate of George Shepherd, appeals the order of the Washington County Circuit Court dismissing her complaint against Appellees, Washington County, Sheriff Kenneth McKee, and Deputy John Doe. The complaint alleged three claims against Appellees for violation of the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101 to -108 (Supp. 1997), tortious outrage, and willful and wanton conduct. The trial court dismissed the complaint pursuant to ARCP Rule 12(b)(6) for failure to state a cause of action under Arkansas law. Appellant raises six points for reversal, which necessarily

involve questions on the law of torts; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(15). We affirm the dismissal of the claim for tortious outrage, but reverse and remand as to the claim of willful and wanton conduct and the civil-rights claim.

The facts that support Appellant's complaint are undeniably tragic. On November 7, 1995, John Manning, an inmate of the Washington County Jail, was transported by Washington County Deputy Pete Williamson to a private medical clinic in Fayetteville for purposes of receiving medical treatment. At the clinic, Manning disarmed Deputy Williamson and, in the process of escaping from custody, shot and killed Deputy Williamson with the officer's gun. While trying to flee the clinic, Manning attempted to take Appellant Sue Shepherd hostage. Appellant broke her foot in her haste to flee from Manning. Appellant's husband George Shepherd intervened on her behalf and was also shot and killed by Manning. Manning then stole the Shepherd's truck and wrecked the vehicle while attempting to flee from officers of the Fayetteville Police Department, who had responded to the 911 call. Manning then lay down on the truck's floorboard and turned the gun on himself, committing suicide.

After receiving briefs and hearing argument from all parties, the trial court granted Appellees' motion to dismiss pursuant to Rule 12(b)(6). The trial court ruled that Appellees had no duty to protect the Shepherds, such that any failure to protect them would rise to the level of a constitutional violation. Even assuming that Appellees had a duty to protect the Shepherds, the trial court reasoned, the complaint still fell short of establishing that the Appellees were deliberately indifferent to their safety; rather, the trial court found that the complaint amounted to no more than an allegation of negligence. The trial court ruled further that the injuries to Appellant and the death of George Shepherd were the result of the intervening criminal actions of inmate Manning. Additionally, the trial court ruled that the facts alleged in the complaint did not state claims for either tortious outrage or willful and wanton conduct on the part of Appellees.

■ ■ We recently set out the test for determining whether a case was correctly dismissed under Rule 12(b)(6) in *Brown v. Tucker*, 330 Ark. 435, 954 S.W.2d 262 (1997):

> In reviewing the denial of a dismissal granted pursuant to Rule 12(b)(6), we treat the facts alleged in the complaint as true and view them in the light most favorable to the party who filed the complaint. *Malone v. Trans-States Lines, Inc.*, 325 Ark. 383, 926 S.W.2d 659 (1996). When the trial court decides Rule 12(b)(6) motions, it must look only to the complaint. *Id.* This court has summarized the requirements for pleading facts as follows:
>
> > Arkansas has adopted a clear standard to require fact pleading: "a pleading which sets forth a claim for relief . . . shall contain (1) a statement in ordinary and concise language of facts showing that the pleader is entitled to relief . . . ." ARCP Rule 8(a)(1). Rule 12(b)(6) provides for the dismissal of a complaint for "failure to state facts upon which relief can be granted." This court has stated that these two rules must be read together in testing the sufficiency of the complaint; facts, not mere conclusions, must be alleged. *Rabalaias v. Barnett*, 284 Ark. 527, 683 S.W.2d 919 (1985). In testing the sufficiency of the complaint on a motion to dismiss, all reasonable inferences must be resolved in favor of the complaint, and pleadings are to be liberally construed. *Id.*; ARCP Rule 8(f).

*Id.* at 437–38, 954 S.W.2d at 264 (quoting *Malone*, 325 Ark. 385, 926 S.W.2d 659 (quoting *Hollingsworth v. First Nat'l Bank & Trust Co.*, 311 Ark. 637, 846 S.W.2d 176 (1993))). With that standard of review in mind, we first address Appellant's arguments pertaining to her civil-rights claim.

## I. Civil-Rights Action

Appellant's first four points for reversal concern the trial court's dismissal of her claim under the Arkansas Civil Rights Act. Appellant argues that the trial court erred in dismissing her civil-rights claim by: (1) failing to find a duty owed by Appellees to protect the Shepherds; (2) finding that the actions of Manning were an intervening cause of the Shepherds' injuries; (3) adopting the standard of care of "deliberate indifference"; and (4) finding

that the complaint did not demonstrate that Appellees had acted with deliberate indifference.

The record reflects that Appellant alleged in her complaint that separate Appellees, Sheriff McKee and Washington County, had a duty under the Arkansas Civil Rights Act and the Arkansas Constitution to maintain control of Manning and to protect the Shepherds and other members of the public from Manning while he was in custody and being treated at a private medical clinic. Appellant alleged that Appellees breached this duty on November 7, 1995, by affirmatively placing the Shepherds in a special position of danger and creating a substantial, excessive risk of serious and immediate harm to them and other patients of private medical facilities where violent inmates are taken. Appellant alleged that Appellees knew of the substantial risk to patients at the medical clinic where Manning was taken and were deliberately indifferent to that risk.

Specifically, Appellant asserts that Appellees acted recklessly and in conscious disregard to the inherent and obvious dangers of: (1) adopting a custom and practice of transporting prisoners in ways which violated the standard taught by the Arkansas Law Enforcement Training Academy (the Academy); (2) adopting a custom and practice of transporting prisoners without having budgeted for or actually having any belly chains available for use in prisoner transport; (3) adopting a custom and practice of allowing deputies to transport prisoners in violation of the standard required for securing and transporting prisoners by the Academy; (4) continuing a policy where deputies are not allowed to wear approved security holsters; (5) not having security holsters for the deputies and not budgeting for such holsters; (6) having a custom and practice of allowing improperly and undertrained officers to transport prisoners, wherein "green" officers were allowed to transport mean inmates, often times alone with improper equipment; (7) not abiding by the Criminal Detention Facility Review Commission's (the Commission) mandated requirement for having a written policy on restraining and dealing with medical/psychiatric-type patients like Manning; (8) having a custom and practice which ignored the Commission's requirement to keep the public away from inmates while at a detention center; (9) not safe-

guarding other patients at medical clinics where dangerous medical/psychiatric-type inmates are being transported; (10) disregarding the warnings from its own deputies that Manning was a serious threat and should not be transported alone, and by not taking adequate measures to secure Manning during transport despite their knowledge that Manning had attacked other deputies, had tried to escape while at the jail, had disarmed another officer while in California, and was suffering from serious mental disorders; (11) not having a written policy for its officers to do a risk-assessment analysis prior to transportation of inmates to a medical clinic; (12) transporting Manning to the medical clinic, and thus putting the medical clinic's patients in increased danger of an assault by an inmate; (13) by placing Appellant in unsafe and close proximity with an inmate who was a known escape risk, and who defendants knew was violent, aggressive, and mentally disturbed; (14) by the Sheriff's reckless failure to adequately train or supervise Deputy John Doe and Deputy Williamson; (15) by Deputy John Doe's choosing and sending an inexperienced lone deputy to transport a known psychotic escape risk to a private medical facility, despite the fact that there were other officers to go with him or in lieu of him; and (16) by sending a lone rookie deputy to escort Manning when they knew that such an assignment required a minimum of two experienced officers. Appellant also alleged that Appellee Deputy John Doe knew of the substantial risk of harm to the patients at the clinic and was deliberately indifferent to that risk in personally assigning an inexperienced lone deputy to transport Manning that day.

The complaint also reflected past experiences with inmate Manning that demonstrated his dangerous and violent tendencies. Particularly, on the day before the shooting, Manning had fought with another inmate, resulting in an injury to Manning for which he was taken to the hospital emergency room by Deputy Williamson. While at the emergency room, Deputy Williamson was relieved by another deputy, who then witnessed Manning make a move for the door in an attempt to escape custody. Afterwards, Manning talked about committing suicide by shooting himself. Upon their return to the jail, the escorting deputy informed his

superiors about Manning's erratic behavior and warned that Manning posed a risk and should not be escorted alone.

It was also stated in the complaint that Manning was violent toward the other inmates and the jailers during his stay at the Washington County Jail, engaging in the following conduct: (1) trying to commit suicide, by hanging himself with his bed sheet; (2) trying to escape, by climbing over the yard wall; (3) physically attacking jailers on two occasions; and (4) cutting his own tongue with razor blades on two occasions, for which he receives stitches. Manning was injured numerous times during fights with other inmates at the jail, requiring him to receive medical attention outside the jail, twice at the hospital emergency room. Manning had been diagnosed in the past with having various psychological disorders, had been treated for such mental disorders, and was on prescription narcotics, including Haldol, for such disorders while he was an inmate in the Washington County Jail. Approximately four months before the shooting, Manning had reported to the jail nurse that the Japanese had been putting images of molesters inside his head; he indicated that he wanted help because he was scared of what he would do. Manning also spoke about the Bible in babbling, psychotic ways and had twice tried to burn out his eyes with cigarettes because he said that the Bible stated that "if the eyes deceiveth thee then pluck them out." One month prior to the shooting, Manning had to be escorted by two jailers whenever he would leave his cell to go to the showers. Additionally, one jailer reported trying to calm Manning by singing "Amazing Grace" to the inmate.

The issue that we must resolve is whether the foregoing facts sufficiently state a cause of action under the Arkansas Civil Rights Act. This issue is one of first impression. We must first determine whether Appellees owed a duty of care to the Shepherds to protect them from harm by a third person. Once a duty of care is found to exist, we must then determine what standard of conduct to apply to defendants in such circumstances. As this court has not had the opportunity to review the substance of a complaint brought under section 16-123-105, we turn to decisions interpreting the federal Civil Rights Act of 1871, 42 U.S.C. § 1983, for guidance on this issue. *See* section 16-123-105(c).

## A. Duty of Care

In *Martinez v. California*, 444 U.S. 277 (1980), the Supreme Court reviewed a 1983 claim that arose out of the murder of a fifteen-year-old girl by a parolee five months after the parolee had been released from prison. The appellants asserted that the state officials' actions in releasing the parolee subjected appellants' decedent to a deprivation of her life without due process of law. Relying upon *Baker v. McCollan*, 443 U.S. 137 (1979), the Court observed that the first inquiry in any suit brought under section 1983 is whether the plaintiff has been deprived by the state of a right secured by the laws and the Constitution of the United States. In holding that the decedent had not been so deprived, the Court stated:

> [T]he Fourteenth Amendment protected her only from deprivation by the "*State* . . . of life . . . without due process of law." Although the decision to release [the parolee] from prison was action by the State, the action of [the parolee] five months later cannot be fairly characterized as state action. Regardless of whether, as a matter of state tort law, the parole board could be said either to have had a "duty" to avoid harm to his victim or to have proximately caused her death, we hold that, taking these particular allegations as true, appellees did not "deprive" appellants' decedent of life within the meaning of the Fourteenth Amendment.
>
> *Her life was taken by the parolee five months after his release. He was in no sense an agent of the parole board. Further, the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger. . . . [W]e do hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law.* Although a § 1983 claim has been described as "a species of tort liability," it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute.

*Id.* at 284-85 (citations omitted) (footnote omitted) (emphasis added).

*Martinez* thus established that where there is no state action resulting in the deprivation of an individual's civil rights,

there is no liability under section 1983. That the injury to the individual was remote in time from any state action is an important consideration in making such a determination. Additionally, *Martinez* made clear that in order to establish liability under section 1983, there must have been a deprivation of a particular individual's rights, as distinguished from those belonging to the general public. Thus, in order to sustain a claim under section 1983, a plaintiff must satisfy the following requirements: (1) the conduct at issue was performed under color of state law; (2) the conduct caused a deprivation of constitutional rights; and (3) the deprivation occurred without due process of law. *See also Screws v. United States*, 325 U.S. 91 (1945).

■ Following the Court's decision in *Martinez*, the Seventh Circuit Court of Appeals was faced with a similar suit under section 1983. In *Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982), the appellant was the administrator of the estate of Marguerite Anne Bowers, who was murdered by Thomas Vanda in 1977. The appellant filed suit against officers and physicians of the Illinois Department of Mental Health and Developmental Disabilities, alleging that they had violated the decedent's civil rights by releasing Vanda in April 1976. Although the court affirmed the lower court's grant of summary judgment to the appellees on the basis of the Supreme Court's decision in *Martinez*, the court warned that if "the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *Id.* at 618. Ultimately, the court concluded that the appellees had not placed the decedent in a position of danger, but had simply failed to adequately protect her, "as a member of the public," from a dangerous individual. *Id.*

■ Similarly, in *Estate of Gilmore v. Buckley*, 787 F.2d 714 (1st Cir. 1986), Patricia Gilmore's executor alleged that the appellees had violated Gilmore's civil rights by releasing inmate Bradford Prendergast from prison for a weekend furlough, during which time Prendergast murdered Gilmore. Unlike the decedents in *Martinez* and *Bowers*, Gilmore had been the victim of the crime for which Prendergast had originally been sentenced to prison.

The First Circuit Court of Appeals recognized that the initial question was whether the failure of the appellees to protect Gilmore from attack by a private third party is actionable under section 1983. Although holding that such action was not cognizable under the facts of that case, the court stated that "in some special circumstances, where a state has assumed a 'special custodial or other relationship' in respect of a particular person, the state's failure to protect that person might implicate the due process clause." *Id.* at 720 (citing *Fox v. Custis*, 712 F.2d 84, 88 (4th Cir. 1983)) (footnote omitted). The court concluded that in order for there to have been a special relationship in that case, the state must have been more directly implicated than it was in the events causing the victim's death, such as where "the state, by exercising custody or control over the plaintiff, effectively strips her of her capacity to defend herself, or *affirmatively places her in a position of danger* that she would not otherwise have been in." *Id.* at 722 (emphasis added).

In *Nishiyama v. Dickson County, Tenn.*, 814 F.2d 277 (6th Cir. 1987), the Sixth Circuit Court of Appeals reversed the lower court's dismissal of the appellants' 1983 claim against Dickson County, Sheriff Doyle Wall, and Deputy Sheriff Carroll Fiser. The complaint alleged that the sheriff's policy and practice of entrusting fully equipped, official patrol cars to inmate Charles Hartman, a convicted felon, deprived their daughter Kathy Nishiyama of her life without due process of law. The facts alleged demonstrated that Hartman, a jail trustee, was cruising alone in the patrol car when he stopped Nishiyama in her vehicle and beat the girl to death. Additionally, the facts showed that Hartman was dangerous and had assaulted a young woman in the past. On the night in question, Hartman had driven Deputy Fiser from the jail to the deputy's farm. Deputy Fiser then told Hartman to drive the car back to the jail. Hartman instead began roaming the highways of three counties, stopping several motorists by using the car's flashing blue lights. When officials in neighboring Montgomery County became aware of the fact that a Dickson County patrol car was stopping motorists in their jurisdiction, they notified the Dickson County dispatcher, who, in turn, notified Sheriff Wall and Deputy Fiser. Neither the sheriff nor the

deputy took any action. Subsequent to this notification, Hartman used the patrol car to pull over Nishiyama's car and murder her.

■ Satisfied with the district court's conclusion that the appellees' practice of providing Hartman with a marked, fully equipped patrol car was action taken under color of state law, the Sixth Circuit held that the appellees' actions did deprive Nishiyama of her constitutional interest in life, focusing on the fact that the appellees had specifically "authorized Hartman to use and have sole control over the patrol car for his own private purposes." *Id.* at 280. The court reasoned further that Hartman had remained in the custody of the Dickson County Sheriff's Department before, during, and after the murder, and that at no time did Hartman attempt to escape that custody. In distinguishing the facts before it from those present in *Martinez*, 444 U.S. 277, where the parolee had been out of police custody for some five months and, thus, the identity of any potential victims was difficult to define, the court stated:

> Here the radius of harm is more distinct. When Fiser and Wall allowed Hartman to drive unescorted between the jail and Fiser's farm, persons in the vicinity were at risk, particularly motorists who out of respect for and fear of law enforcement vehicles respond to blue flashing lights. The identification of potential victims became even easier once the sheriff's department was notified that its patrol car was stopping motorists in Montgomery County. The defendants should have known that Hartman was stopping unwitting motorists under the aura of law enforcement represented by the patrol car and that, as a result, drivers like Kathy Nishiyama in Montgomery and surrounding counties were in jeopardy.

*Id.* The court went on to distinguish these facts from those in *Martinez* by holding that the death of Nishiyama was not so remote a consequence of the appellees' actions, through their established practice of entrusting the patrol car to Hartman. As opposed to those cases in which the state officers merely possessed information that circumstances endangering the public existed, the state actors here took the further step of facilitating the crime with their actions "by providing the criminal with the necessary

means and the specific opportunity to commit his crime." *Id.* at 281.

In *Wells v. Walker*, 852 F.2d 368 (8th Cir. 1988), upon which Appellant relies, the appellants represented the estate of Laverne Sanderlin, who ran a small store in Dumas, Arkansas. Sanderlin's store also served as a bus station and a "commercial transportation pick-up point" for the Arkansas Department of Correction, where released prisoners were dropped off to catch buses for their destinations. Parolee Larry Dean Robertson was dropped off at Sanderlin's store on April 20, 1987, at approximately 6:50 p.m. and was scheduled to catch a bus leaving the following day around noon. Robertson did not catch his bus the following day, and at approximately 1:30 p.m., he murdered Sanderlin at her store. The appellants alleged that the state prison officials had violated Sanderlin's civil rights by releasing Robertson and transporting him to Sanderlin's store without a warning that he was dangerous.

 The Eighth Circuit Court of Appeals observed that the first issue to be determined was whether Sanderlin possessed a right arising under the Fourteenth Amendment to be protected by the state from harm inflicted by a third party, and, if so, whether the state defendants' conduct had deprived her of such right within the meaning of the due process clause. The court observed further that as a general rule, members of the public at large have no constitutional right to be protected by the state from harm inflicted by third parties. The court then acknowledged the various decisions that recognized the two situations in which a particular individual, as distinguished from the general public, is entitled to state protection from harm by third parties: (1) when a special custodial or other relationship created or assumed by the state exists between the individual and the state, and (2) when the state affirmatively places the particular individual in a position of danger in which the individual would not otherwise have been. *Id.* (citing *Fox*, 712 F.2d 84, and *Bowers*, 686 F.2d 616). The court explained that "in these situations an affirmative right to protection by the state may arise in favor of the victim of private violence." *Id.* at 371. The court held:

> We believe plaintiffs' complaint adequately pleads the basis of Sanderlin's right of protection. Plaintiffs allege defendants took

> action under Arkansas law to provide postrelease transportation for Robertson and to utilize Sanderlin's store as "the closest commercial transportation pick-up point." *These actions had the result of placing Sanderlin, unlike members of the general public, in a[n] unique, confrontational encounter with a person whom plaintiffs allege had exhibited violent propensities.* We thus agree with the district court's assessment that "the allegations of the complaint . . . when taken as true could support a finding of a 'close relationship' . . . or the existence of a 'special danger' to [Sanderlin]" in the context of a violation of Sanderlin's due process rights.

*Id.* (citations omitted) (emphasis added). Notwithstanding that holding, the court concluded that the defendants' conduct did not deprive Sanderlin of her constitutional rights, as the complaint failed to characterize their conduct as anything other than ordinary negligence.

■ In *Cornelius v. Town of Highland Lake, Alabama*, 880 F.2d 348 (11th Cir. 1989), the appellant Harriet Cornelius alleged that the state and municipal defendants had violated her civil rights by failing to protect her from two prison inmates who were assigned to a community work program at the town hall in Highland Lake, where Cornelius worked as the town clerk. The facts showed that on November 8, 1985, Cornelius was abducted at knife point by two work-squad inmates, forced to surrender her car to them, and accompany them in their flight through three states. During her abduction, the inmates held Cornelius hostage for three days, wherein they terrorized her by threatening to sexually and physically abuse her and kill her. Ultimately, the two inmates left Cornelius tied to a tree outside Columbus, Georgia. In discussing the "special relationship" test, the Eleventh Circuit Court of Appeals stated:

> Under the analysis, government officials may be held liable for the deprivation by a third party of a private citizen's due process rights when a special relationship is found to exist between the victim and the third party or between the victim and the government officials. *Wright v. City of Ozark*, 715 F.2d 1513, 1515 (11th Cir. 1983). When the duty which arises by virtue of the special relationship is coupled with some degree of culpable conduct on the defendant's part, § 1983 liability attaches.

*Id.* at 352-53 (footnote omitted). The court concluded that the facts alleged in the complaint raised an issue as to whether Cornelius and the defendants enjoyed a special relationship, such that the state had assumed responsibility to protect her. The court emphasized the fact that Cornelius worked for some of the defendants and that, if she wanted to continue her employment as town clerk, "she had to work in the environment created by the town officials; one that included routine exposure to prison inmates around the town hall." *Id.* at 355. The court held further:

> In this case, the defendants did indeed create the dangerous situation of the inmates' presence in the community by establishing the work squad and assigning the inmates to work around the town hall. Moreover, the defendants increased Mrs. Cornelius's vulnerability to harm by regularly exposing her to the work squad inmates by virtue of her position as Town Clerk. These actions, coupled with the degree of control the town officials exercised over Mrs. Cornelius as Town Clerk, lead us to conclude that there is a genuine issue relevant to the existence of a special relationship between the town officials and the plaintiff implicating her due process rights.

*Id.* at 356 (footnote omitted). Relying on the Sixth Circuit's holding in *Nishiyama*, the court concluded:

> [T]he prison officials' established practice of assigning dangerous prisoners to the community work squads and entrusting their supervision to town officials with no training in handling prisoners, as well as the town officials' actions in assuming custody of the dangerous prisoners without the proper training, "set in motion the specific forces that allowed [the inmates] to commit [their] crime."

*Id.* at 357 (quoting *Nishiyama*, 814 F.2d at 281).

From the foregoing decisions, the evolution of civil-rights claims and liability under section 1983 is apparent. The Court's decision in *Martinez*, 444 U.S. 277, established that any claim pursuant to section 1983 must state facts demonstrating that the conduct of a state actor deprived a particular individual of his or her constitutional rights without due process of law. In determining whether it was state action that resulted in the deprivation of constitutional rights, the Court considered the fact that the injury to

the individual was remote in time from the state action. In *Bowers*, 686 F.2d 616, the court cautioned that even though the state action was not the direct cause of the deprivation of the individual's rights, where the state puts an individual in a position of danger from the acts of a third party, the state may be liable under section 1983. In *Buckley*, 787 F.2d 714, the court recognized two situations in which the state could be held liable under section 1983 for the deprivation of an individual's civil rights by a third party: (1) where the state has assumed a "special custodial or other relationship" with respect to the individual, or (2) where the state has affirmatively placed an individual in a position of danger from third parties. In *Nishiyama*, 814 F.2d 277, the court held that where the state actors had, by established practice, facilitated the deprivation of the individual's constitutional rights by providing the third party with the specific means and opportunity to commit the crime against the individual, liability would result under section 1983. The *Nishiyama* court also recognized that although an individual may not be personally known to the state actors, the fact that he or she is part of an identifiable group of potential victims satisfies the requirement under the due process clause that there be a deprivation of a particular individual's rights. Moreover, the court in *Nishiyama* considered important the fact that the harmful action was committed by an inmate who was at all relevant times in the custody and control of the state defendants.

In *Wells*, 852 F.2d 368, the court recognized that where the state actors used an individual's place of business for the purpose of releasing paroled prisoners, liability attaches under section 1983, as the state actors were said to have affirmatively placed the individual in an unique confrontational encounter with potentially dangerous persons. In *Cornelius*, 880 F.2d 348, the court held that state actors may be liable upon a showing of a "special relationship" between the individual victim and the third party or between the victim and the government actors. The *Cornelius* court stated that a "special relationship" exists where the dangerous environment was created by an established practice of the state actors, thereby increasing the individual's vulnerability to harm by others, and where the state actors exercised a significant degree of control over the individual victim, such that she was required to

expose herself to the dangerous situation in order to keep her job. The *Cornelius* court also noted that the state and municipal actors had established a practice of assigning dangerous prisoners to the work squads and entrusting their supervision to persons untrained in the handling of prisoners.

 This court has often stated that ordinarily one is not liable for the acts of another party *unless* a special relationship exists between the tortfeasor and the victim. *See, e.g., First Commercial Trust Co. v. Lorcin Eng'g, Inc.*, 321 Ark. 210, 900 S.W.2d 202 (1995); *Bartley v. Sweetser*, 319 Ark. 117, 890 S.W.2d 250 (1994); *Keck v. American Employment Agency, Inc.*, 279 Ark. 294, 652 S.W.2d 2 (1983). In *Smith v. Hansen*, 323 Ark. 188, 914 S.W.2d 285 (1996), this court cited with approval that portion of the *Restatement (Second) of Torts* dealing with such liability:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

*Id.* at 196, 914 S.W.2d at 289 (quoting *Restatement (Second) of Torts* § 315 (1965)).

Here, Appellant's claim was filed pursuant to the Arkansas Civil Rights Act, which differs somewhat from section 1983. Section 16-123-105, included within the Act, provides in pertinent part:

> (a) Every person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action at law, a suit in equity, or other proper proceeding for redress.

Article 2, § 2, of the Arkansas Constitution of 1874 provides in part that "[a]ll men are created equally free and independent, and have certain inherent and inalienable rights, amongst which are

those of enjoying and defending life and liberty[.]" Article 2, § 8, of the Arkansas Constitution guarantees that no person shall be "deprived of life, liberty or property, without due process of law," as does the Fourteenth Amendment to the United States Constitution. It is within these constitutional provisions that Appellant makes her claim.

Applying the teachings of the foregoing cases to the circumstances presented in this case, we believe that Appellant's complaint sufficiently states facts to form the basis of a civil-rights claim. The facts demonstrate that Appellees were aware that inmate Manning had violent tendencies, had previously attempted to escape from their custody, had inflicted injury upon himself and others, had a history of mental disorders for which he was receiving medication, and had expressed a desire to commit suicide by shooting himself the very day before the tragic incident involving the Shepherds. The facts alleged in the complaint, demonstrating that Appellees' actions in taking this particular violent inmate to a private medical clinic where other persons would be without taking necessary precautions to protect any potential victims at the clinic from being harmed by the inmate, support the allegation that the state actors affirmatively placed the Shepherds in a position of danger.

Additionally, as in *Nishiyama*, the facts alleged here show that inmate Manning was at all relevant times in the custody and control of Appellees. Though we realize that Appellees had an affirmative obligation to bring Manning to the private clinic to receive the medical treatment recommended by a physician, we believe that they also had an obligation to protect the individuals present at the clinic from any harm that might have resulted from Manning's known violent tendencies. In this respect, when Appellees transported Manning from the secured environment of the jail to the unsecured setting of the medical clinic, they were effectively transferring the custodial situation from the jail to the clinic. Accordingly, they had an obligation to secure the clinic and anyone present from the risk of harm from Manning. Their alleged failure to do this was particularly critical under the facts and circumstances of this case, because Appellees were aware that Manning could barely be controlled by two jailers in the secured

environment of the jail, let alone by one deputy in an unsecured place such as the medical clinic. As was the case in *Wells*, here, the facts pleaded show that Appellees placed the Shepherds in an unique confrontational encounter with a potentially dangerous individual. We caution that we do not, by this decision, attempt to establish the specific procedures to be followed when transporting a violent inmate from the jail to an unsecured public place for medical treatment. We hold only that the alleged actions or inactions taken by Appellees in this case fell short of their duty to protect potential victims from the harm created by this inmate.

We thus conclude that Appellant has pleaded facts sufficient to support a determination that Appellees had a duty to protect her and her husband from the violence that befell them as the result of inmate Manning's actions. When Appellees undertook to transport Manning from the secured confines of the jail to an unsecured environment, they in effect relocated the custodial environment to the private clinic. These actions support a finding of a special custodial relationship between Appellees and the Shepherds, such that Appellees had a duty to protect them from the violent actions committed by Manning. We conclude further that even though the Shepherds were not personally known by Appellees to be patients at the clinic on that date, they were part of an identifiable group of potential victims of which Appellees were aware. In sum, we believe that when viewing the complaint liberally and taking the facts alleged as true, Appellant sufficiently demonstrated that the actions or inactions taken by Appellees deprived the Shepherds of their constitutional rights to life and liberty in violation of section 16-123-105 and the Arkansas Constitution.

Because we conclude that, under the particular facts alleged in this case, Appellees owed a duty to protect the Shepherds and the other patients and staff present at the medical clinic that date, we must now determine the proper standard of conduct to be imposed on defendants in such a situation. We need not address the trial court's determination that the damage to the Shepherds was caused by the intervening criminal actions of Manning, as our determination that Appellees had a duty to protect the Shepherds

from harmful actions committed by Manning renders that issue moot.

## B. Standard of Conduct

Appellant urges this court to adopt a less-stringent standard of care than that of "deliberate indifference," which has been applied by the federal courts. Appellant advocates that we adopt a standard of conduct of "gross negligence." Appellee, on the other hand, urges that we adopt the federal standard of "deliberate indifference." Appellant alternatively contends that the facts set out in the complaint are sufficient to support a showing that Appellees acted with deliberate indifference, as defined by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994). For the reasons outlined below, we decline to adopt either of the proposed standards. A review of the federal decisions in this area is helpful to our determination.

In *Daniels v. Williams*, 474 U.S. 327 (1986), the Supreme Court held that an allegation of a civil-rights violation based upon the negligence of state actors was not sufficient to sustain a suit under section 1983. The Court concluded that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Id.* at 328. The Court reasoned:

> Historically, this guarantee of due process has been applied to *deliberate decisions of government officials to deprive a person of life, liberty, or property.* . . . This history reflects the traditional and common-sense notion that the Due Process Clause, like its forebear in the Magna Carta, . . . was "'intended to secure the individual from the arbitrary exercise of the powers of government,'" *Hurtado v. California*, 110 U.S. 516, 527 (1884) (quoting *Bank of Columbia v. Okely*, 4 Wheat. 235, 244 (1819)). . . . By requiring the government to follow appropriate procedures when its agents decide to "deprive any person of life, liberty, or property," the Due Process Clause promotes fairness in such decisions. And by barring certain government actions regardless of the fairness of the procedures used to implement them, . . . it serves to prevent governmental power from being "used for purposes of oppression[.]"

*Id.* at 331-32 (citations omitted) (emphasis added). In a related case, the Court clarified its holding in *Daniels*, stating that "[i]n other words, where a government official is merely negligent in causing the injury, no procedure for compensation is *constitutionally* required." *Davidson v. Cannon*, 474 U.S. 344, 347 (1986) (emphasis added). The Court explained:

> Respondents' lack of due care in this case led to serious injury, but that lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent. . . . The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials.

*Id.* at 347-48. Thus, *Daniels* and *Davidson* established that an allegation that state actors negligently deprived an individual of his civil rights is not sufficient to impose liability under section 1983; rather, such a deprivation must have been the result of a deliberate decision by the state actors.

In *Farmer*, 511 U.S. 825, the Supreme Court defined "deliberate indifference" within the confines of an action by a prisoner against state officials under the Eighth Amendment:

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; *the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.*

*Id.* at 837 (emphasis added). While the definition announced in *Farmer* may work well in analyzing claims of cruel and unusual punishment within the framework of the Eighth Amendment, we do not agree that such standard of conduct is appropriate under our State's civil-rights law. We opt, instead, for the standard of "conscious indifference," as defined by this court's previous decisions.

In *Freeman v. Anderson*, 279 Ark. 282, 651 S.W.2d 450 (1983), this court held that in order to show that a defendant acted

with conscious indifference, it must appear that he knew or had reason to believe that his actions were about to inflict injury, and that he continued in his course with a conscious indifference to the consequences of his actions, from which malice may be inferred. Similarly, in *National By-Products, Inc. v. Searcy House Moving Co., Inc.*, 292 Ark. 491, 731 S.W.2d 194 (1987), this court outlined the necessary proof to establish that one had acted wantonly and with a conscious indifference to the consequences:

> Wantonness is essentially an attitude of mind and imparts to an act of misconduct a tortious character, such conduct as manifests a 'disposition of perversity.' *Such a disposition or mental state is shown by a person, when, notwithstanding his conscious and timely knowledge of an approach to an unusual danger and of common probability of injury to others, he proceeds into the presence of danger, with indifference to consequences and with absence of all care.*
>
> . . .
>
> It is not necessary to prove that the defendant deliberately intended to injure the plaintiff. *It is enough if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequence of his act was injury to the plaintiff.*

*Id.* at 493-94, 731 S.W.2d at 195-96 (emphasis added) (quoting *Ellis v. Ferguson*, 238 Ark. 776, 385 S.W.2d 154 (1964)).

Thus, in order to demonstrate that a defendant acted with conscious indifference, a plaintiff must show that the defendant "knew or ought to have known, in the light of the surrounding circumstances, that his conduct would naturally or probably result in injury and that he continued such conduct in the reckless disregard of the consequences from which malice can be inferred." *Stein v. Lukas*, 308 Ark. 74, 78, 823 S.W.2d 832, 834 (1992) (quoting *Dongary Holstein Leasing, Inc. v. Covington*, 293 Ark. 112, 732 S.W.2d 465 (1987), *rev'd on other grounds*, 299 Ark. 431, 773 S.W.2d 94 (1989), (citing to Arkansas Model Jury Instruction 2217)). "Hence, malice can be inferred either from a conscious indifference to the consequences of one's actions or from a reckless disregard of those same consequences." *Id.*

Applying that standard to the circumstances of this case, we believe that Appellant has pleaded sufficient facts to sup-

port a showing that Appellees acted with conscious indifference to the probable consequences of their actions or inactions in handling inmate Manning at the clinic. Taking the facts alleged in the complaint as true, as we are required to do, Appellees knew that Manning had violent tendencies, had previously attempted to escape custody, had fought with other inmates and jailers, had intentionally injured himself on two separate occasions, had attempted to commit suicide in his jail cell, and had talked about committing suicide by shooting himself the day before the incident in question occurred. The facts alleged also demonstrate that Appellees were aware of the risks involved in transporting inmates, but that they disregarded these risks by sending a lone officer, who was not sufficiently trained nor properly equipped, to handle this particular inmate in a public place. The facts alleged thus support a finding that Appellees were indifferent to the consequences of their actions in transporting Manning to the clinic by failing to take the necessary precautions to protect the persons present from the inmate. We are not persuaded by Appellees' argument that the complaint failed to allege actual knowledge of Manning's violent tendencies on the part of the sheriff. We believe that Appellant has pleaded sufficient facts pertaining to the sheriff's knowledge for purposes of our review under Rule 12(b)(6).

Accordingly, we reverse the trial court's dismissal of the civil-rights claim and remand this issue for further proceedings consistent with this opinion.

## II. Willful and Wanton Conduct

For her next point for reversal, Appellant contends that the trial court erred in dismissing her tort claim against Appellees for engaging in willful and wanton conduct, which resulted in harm to the Shepherds. We agree.

Incorporating all the facts alleged in the civil-rights claim, Appellant argues that based on the sheriff's experience and training, he knew just how dangerous prisoner escorts could be and that such escorts posed a safety risk to the public. Despite this, he consciously disregarded the risk by sending that particular inexperienced and under-equipped deputy, with that particular violent, psychotic inmate, to the private medical clinic at a particular time

when other patients would be present. Appellant contends further that the fact that the sheriff later admitted that the problem stemmed from "green" deputies taking care of mean inmates, and that the public should never be exposed to this problem, the sheriff demonstrated that he consciously disregarded a known risk.

To constitute willful or wanton conduct, this court has stated that there must be a deliberate intention to harm or an utter indifference to, or conscious disregard of, the safety of others. *Young v. Paxton*, 316 Ark. 655, 873 S.W.2d 546 (1994); *Daniel Constr. Co. v. Holden*, 266 Ark. 43, 585 S.W.2d 6 (1979). In *Croom v. Younts*, 323 Ark. 95, 913 S.W.2d 283 (1996), this court cited with approval the definition of willful or wanton conduct supplied in Arkansas Model Jury Instruction 404:

> A person acts willfully and wantonly when he knows or should know in the light of surrounding circumstances that his conduct will naturally and probably result in emotional distress [and bodily harm] and continues such conduct in reckless disregard of the consequences.

*Id.* at 101, 913 S.W.2d at 286.

Here, the trial court ruled that based upon the facts alleged in the complaint, reasonable minds could not disagree as to whether Appellees' conduct was willful and wanton. Whether reasonable minds could not disagree that Appellees' conduct was or was not willful and wanton is not the test for reviewing a complaint under Rule 12(b)(6). Instead, in testing the sufficiency of the complaint, the pleadings are to be liberally construed, with all reasonable inferences being resolved in favor of the complaint. *Brown*, 330 Ark. 435, 954 S.W.2d 262. Moreover, we treat the facts alleged in the complaint as true and view them in a light most favorable to the party who filed the complaint. *Id.*

For the reasons previously outlined with regard to "conscious indifference," we are satisfied that the allegations contained in the complaint, taken as true and construed liberally, state sufficient facts to support a claim that Appellees acted willfully or wantonly. Accordingly, we reverse the trial court's order dismissing the tort claim of willful and wanton conduct, and remand for further proceedings consistent with this opinion.

### III. Outrage

For the last point for reversal, Appellant argues that the trial court erred in ruling that the complaint failed to state sufficient facts that would support a claim for tortious outrage. Incorporating all the facts alleged in the civil-rights claim, Appellant additionally asserts that the outrage lies in the following facts alleged in her complaint: (1) the sheriff knew the dangers posed by prisoner escorts, but ignored that risk; (2) the sheriff had none of the required written policies for dealing with medical/psychiatric-type inmates like Manning; (3) the sheriff knew that inmate Manning was violent, psychotic, a known escape risk, and that Manning had attacked and attempted to disarm officers in the past; (4) the sheriff had been warned the night before that two guards should be sent to escort Manning, and he later admitted that he should have sent two guards with Manning; (5) the one guard, Deputy Williamson, sent by the sheriff had only been a jailer for eight months, had never been to the police academy, was not a certified law enforcement officer, and had been reprimanded on a previous escort for failing to keep track of his inmates; (6) Deputy Williamson did not shackle inmate Manning properly because there were no belly chains available; (7) the sheriff did not provide his deputies with security holsters designed to prevent anyone other than the officer from pulling out the guns; (8) there were other more experienced guards available for the escort, but the sheriff sent Deputy Williamson alone because it would be "good training"; and (9) the sheriff later admitted that the problem was "green" deputies escorting mean inmates, and that the public should never be exposed to this. We do not agree that these facts support a claim that Appellees engaged in outrageous behavior, as defined by this court's prior decisions.

To establish an outrage claim, the plaintiff must show: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community"; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable man

could be expected to endure it. *Brown*, 330 Ark. 435, 954 S.W.2d 262.

The trial court dismissed the outrage claim, relying in part on this court's previous holdings that the tort of outrage is not favored by this court and that clear-cut proof is required to establish the elements in outrage cases. *See, e.g., Croom*, 323 Ark. 95, 913 S.W.2d 283; *Ross v. Patterson*, 307 Ark. 68, 817 S.W.2d 418 (1991); *Cordes v. Outdoor Living Ctr.*, Inc., 301 Ark. 26, 781 S.W.2d 31 (1989); *Harris v. Arkansas Book Co.*, 287 Ark. 353, 700 S.W.2d 41 (1985); *Givens v. Hixson*, 275 Ark. 370, 631 S.W.2d 263 (1982). We agree with the trial court's ruling on this claim, as we can see no facts that would support a finding of the second element required to prove a claim of outrage, that the conduct of Appellees was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community." For this reason, we affirm as to the dismissal of the outrage claim.

Affirmed in part; reversed and remanded in part.