Joe RUDD, Administrator of the Estate of
Earl James Routt, Deceased, and Carol Rudd,
Holly Welzbacher, and Judson Routt *v.*
PULASKI COUNTY SPECIAL SCHOOL DISTRICT,
Margie Davis, Gary Smith, and Gary Parsons

00-128                                    20 S.W.3d 310

Supreme Court of Arkansas
Opinion delivered June 29, 2000

*Chris Piazza*, Judge;

*Andrew L. Clark*, for appellant.

*Skokos, Bequette & Billingsley, P.A.*, by: *Keith I. Billingsley*, for appellees.

RAY THORNTON, Justice. Appellant Joe Rudd, personally and as administrator of the estate of Earl Jameson Routt, deceased, and his family appeal an order of the Pulaski County Circuit Court granting summary judgment in favor of the appellees, the Pulaski County Special School District and its employees. Appellants instituted litigation against appellees, asserting theories of liability under the Arkansas Civil Rights Act and negligence. The trial court granted summary judgment, ruling that the Arkansas

Civil Rights Act does not extend to the undisputed facts of this case, and that the school district was immune from suit to recover damages resulting from negligence. We affirm the trial court's grant of summary judgment.

This case involves a shooting on a school bus in Jacksonville. At the time of the shooting in October 1996, the victim, Earl Routt, was a student at Jacksonville High School and regularly rode a school bus owned and operated by appellee, Pulaski County Special School District. Appellee Margie Davis typically drove the school bus on which Routt was a passenger.

W.J., another student at Jacksonville High School, also rode Davis's school bus. W.J. and the victim frequently had confrontations, and the driver had admonished both boys on previous occasions. During the previous year, while W.J. was enrolled as a student at Sylvan Hills Junior High School, his disciplinary record showed several offenses which included the following: expulsion from school for bringing a knife to school and assaulting another student with that knife on a school bus, an action which Sylvan Hills Junior High School Principal Sue Clark noted as a "substantial risk;" fighting in class; disorderly conduct; roughhousing in class; being a member of a gang that had violent initiation rites; and persistent disregard for school rules and authority. Ms. Clark testified in her deposition that the disciplinary records "do not follow a student from one school to another. . . . [T]he disciplinary records are closed, terminated, resolved, and we just follow the records retention policy for those." These incidents occurred approximately seven months prior to the October shooting at Jacksonville High School. According to appellants, the records were kept in the ordinary course of business by officials of the school district which operates many schools, including those of Sylvan Hills and Jacksonville.

On October 9, 1996, W.J. brought a hand gun to Jacksonville High School and kept it in his locker. The school district had a policy which prohibited weapons on school property. On the day of the shooting, another student advised one or more of his teachers that he overheard a conversation concerning W.J., a gun, and something that was going to happen after school. According to the other student, two searches occurred on that day, but neither search turned up a weapon. That afternoon, while riding on the school

bus, W.J. pulled out the hidden hand gun and fired it numerous times at the victim, who died as a result of the shooting.

Appellants brought the present action against appellees in Pulaski County Circuit Court, seeking compensation for the deprivation of Routt's civil liberties. First, appellants claim that appellees violated the victim's civil rights under the Arkansas Civil Rights Act by failing to adequately protect him while he was in their custody. Second, appellants alleged that appellees' negligence was the sole and proximate cause of the violation of the victim's civil rights leading to his death. Appellees responded that they were entitled to absolute immunity from tort liability in the performance of their official duties pursuant to Ark. Code Ann. § 21-9-301 (Repl. 1996).

■ After examining the pleadings, motions, briefs in support of the motions, and answers to interrogatories, the trial court granted defendant's motion for summary judgment. We have stated that the moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as matter of law. Ark. R. Civ. P. 56; *McCutchen v. Huckabee*, 328 Ark. 202, 943 S.W.2d 225 (1997).

### I. Arkansas Civil Rights Act

Appellants argue that the school district had a special custodial relationship with the victim under the Arkansas Civil Rights Act, and that such relationship imposed a duty to protect the victim from a violation of his civil rights. Arkansas Code Annotated § 16-123-105 (Supp. 1999) defines civil rights offenses. The statute provides in pertinent part:

> (a) Every person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action at law, a suit in equity, or other proper proceeding for redress.

*Id.* Arkansas Code Annotated § 16-123-105 further provides that, when construing the above section, we may look for guidance to state and federal decisions that interpret the Federal Civil Rights Act of 1971, as amended and codified in 42 U.S.C. § 1983 (1994)(hereinafter "§ 1983").

In the present case, both the perpetrator, W.J., and the victim were students attending the same high school and riding the same school bus. We first inquire into the relationship of the perpetrator, W.J., to the school district, to determine whether he was a state actor. Is there a custodial relationship between the school and W.J. requiring the school to restrict W.J.'s capability to do harm to others? If so, does the school district's failure to maintain restraints on W.J. transform him into a state actor for the purpose of triggering the provisions of the Arkansas Civil Rights Act?

We have addressed similar questions as issues of first impression in *Shepherd v. Washington County*, 331 Ark. 480, 962 S.W.2d 779 (1998). In *Shepherd*, we traced recent federal cases in which the courts have held that a custodial relationship exists between the government and convicted felons in custody. *See Martinez v. California*, 444 U.S. 277 (1980)(holding that a plaintiff must satisfy three requirements in order to sustain a claim under § 1983 of the Federal Civil Rights Act); *Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982)(holding that when the State puts an individual in a position of danger from the acts of a third party, the State may be liable under § 1983); *Estate of Gilmore v. Buckley*, 787 F.2d 714 (1st Cir. 1986)(holding that the State could be held liable under § 1983 for the deprivation of an individual's civil rights by a third party where the State has assumed a "special custodial or other relationship" with respect to the individual, or where the State has affirmatively placed an individual in a position of danger from third parties); *Nishiyama v. Dickson County, Tenn.*, 814 F.2d 277 (6th Cir. 1987)(holding that where the state actors had, by established practice, facilitated the deprivation of individual's constitutional rights by providing the third party with specific means and opportunity to commit the crime against the individual, liability would result under § 1983); *Wells v. Walker*, 852 F.2d 368 (8th Cir.1988)(holding that when the state actors used an individual's place of business for the purpose of releasing paroled prisoners, liability attaches under § 1983, as the state actors were said to have affirmatively placed the

individual in an unique confrontational encounter with potentially dangerous persons).

In *Shepherd, supra,* the victim's surviving spouse, individually and on behalf of the victim's estate, filed an action against the county and sheriff for her own injuries and for the victim's death, caused by an inmate who escaped from custody while receiving medical treatment at a clinic. The trial court ruled that the county and sheriff did not have a duty to protect the appellants. On appeal, we concluded that appellant had pleaded facts sufficient to support a determination that appellees had a duty to protect her and her husband from violence that befell them as the result of the actions of the prisoner who had escaped from custody. The facts in *Shepherd* demonstrated that appellees were aware that the inmate had violent tendencies, had previously attempted to escape from their custody, had inflicted injury upon himself and others, had a history of mental disorders for which he was receiving medication, and had expressed a desire to commit suicide by shooting himself the very day before the tragic accident involving the appellants. Accordingly, we reversed the trial court's dismissal of the civil-rights claim and remanded the issue. *Id.*

The foregoing cases are distinguishable from the present litigation because in those cases, a custodial relationship existed between the State and a convicted felon. In *Shepherd,* the custodial relationship between the inmate and the State imposed a duty upon the State to protect third persons from injury inflicted by the inmate who escaped from custody. A prisoner is subject to restraints in order to protect the public, and the failure to maintain such restraints may result in liability for injuries to third persons under the Arkansas Civil Rights Act. *Id.*

Here, the relationship of a student to a school bus driver is not the same as that of a prisoner and his warden. It does not appear that the school district or the driver of the bus had police authority to deprive W.J. of his liberty interest by placing physical restraints upon his actions. While schools should foster a sense of safety for students in order to provide an environment in which students can learn, school officials should not be placed in a position where enforcing physical restraints takes precedence over their primary purpose of teaching and carrying out administrative duties. In the circumstances of this case, we conclude that W.J. was not a state

actor, and that the school district's failure to impose and maintain restraints upon him did not trigger the provisions of the Arkansas Civil Rights Act.

We next address the question whether, under the Arkansas Civil Rights Act, the school had a special relationship with the victim, thereby imposing a duty upon the school to protect him from violent acts by another student. When construing the Arkansas Civil Rights Act, according to Ark. Code Ann. § 16-123-105(c), we may look for guidance to federal decisions. In *Dorothy v. Little Rock School District*, 794 F. Supp. 1405 (E.D. Ark. 1992), the mother of a student in a high school community-based instruction program brought a § 1983 action against the Little Rock School District, Department of Human Services, and Centers for Youth and Families after her son was allegedly sexually molested and raped by a fellow student, a ward of the State, while attending a special school program.

Her son attended the school program when he was assaulted by Louis C., another student in the program. At the time, Louis C. was a ward of the Arkansas Department of Human Services (hereinafter "DHS") and had been placed in a foster care program with the Centers for Youth and Families (hereinafter "Centers"). DHS and Centers were aware of Louis C.'s disposition for violence and sexually assaultive behavior, but decided to enroll Louis C. in the program without taking adequate precautions to see that other students were protected from him. The school district also knew of Louis C.'s propensity for such behavior, but allowed the two boys to be left alone unsupervised, and the assault took place during that time. Brian B.'s mother filed an action against DHS, Centers, and the school district, alleging that defendants' affirmative duty to protect arose from the special custodial relationship created by compulsory school attendance laws, and her son's harm was caused by customs, practices, or policies of the governmental entities. *Id.*

■ The *Dorothy* court held that no custodial relationship existed between the victim and the state that was sufficient to impose on the state an affirmative duty to protect. *Id.* The district court rejected the existence of a custodial relationship based on the following analysis:

> The Court, however, must reject the broad view of "custody" based on state compulsory attendance laws taken in the foregoing

cases, and argued here by the plaintiff. That view would expand constitutional duties of care and protection to millions of school-children. School officials would be subject to § 1983 liability anytime a child skinned his knee on the playground or was beat-up by the school bully, so long as the requisite "state of mind" was shown. *More seriously, with the epidemic of deadly violence on many school campuses today, teachers would be constitutionally obliged to assume roles similar to policemen or even prison guards in protecting students from students. The precise contours of an affirmative duty to care and protect would be much more difficult to define in public schools.*

*Id.* (emphasis added).

The *Dorothy* court pointed out that the United States Supreme Court has not extended the duty of protection beyond the cases of incarcerated prisoners and involuntarily committed mental patients. The district court reasoned that such a duty of protection should not extend to school officials because "teachers would be constitutionally obliged to assume roles similar to policemen or even prison guards in protecting students from other students." *Id.* The district court concluded that no special relationship giving rise to a duty to protect against harm from private individuals existed by the State's action of putting the two students in contact with one another, despite the State's knowledge of Louis C.'s violent propensities. *Id.*

■ In the present case, it is contended that because of W.J.'s violent history at Sylvan Hills Junior High School, the Jacksonville High School officials should not have allowed the victim to be placed in a dangerous position. Although the school district had knowledge of W.J.'s propensities during his prior academic year at Sylvan Hills Junior High School, appellants presented no evidence of similar behavior while W.J. was enrolled at Jacksonville High School. We conclude that no special relationship was shown to exist between the victim and the state imposing a duty upon the state under the provisions of the Arkansas Civil Rights Act to protect the victim from harm.

## II. Negligence

Appellants also presented a theory of negligence. The issue of negligence was raised in appellants' jurisdictional statement, but the issue of recovery on the basis of negligence giving rise to liability

for a tort was not raised in either of appellant's points on appeal or in the argument section of their brief. Appellants do not appear to contest the grant of summary judgment with respect to the allegation of negligence.

Had appellants pursued the theory of recovery of damages for tort liability under a claim of negligence, they would not have prevailed because of appellees' sovereign immunity. Under Ark. Code Ann. § 21-9-301, "[i]t is declared to be the public policy of the State of Arkansas that all . . . school districts. . . shall be immune from [tort] liability and from suit for damages except to the extent that they may be covered by liability insurance. No tort action shall lie against any such political subdivision because of the acts of its agents and employees." *Id.*

Accordingly, we affirm the trial court's grant of summary judgment.

Affirmed.