# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3577

_____

Jerala Grayson, as personal    *
representative for the Estate of    *
Daniel Neal Grayson,    *
   *
       Plaintiff/Appellant,    *
   *    Appeal from the United States
       v.    *    District Court, Western District
   *    of Arkansas.
Bob Ross, individually and in his    *
official capacity as a Crawford    *
County Sheriff,    *
   *
       Defendant/Appellee,    *
   *
John McAllister, individually and in his    *
official capacity as a Crawford County    *
Deputy; Chris Porter, individually and    *
in his official capacity as a Crawford    *
County Deputy,    *
   *
       Defendants/Appellees,    *
   *
Roy Bass, individually and in his    *
official capacity as a Crawford County    *
Deputy,    *
   *
       Defendant,    *
   *
Michael Sharum, individually,    *
   *
       Defendant/Appellee.    *

_____

Submitted: November 18, 2005
Filed: July 19, 2006

_____

Before ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

BEAM, Circuit Judge.

Daniel Neal Grayson (Grayson) died October 15, 2000, following self-mutilation while incarcerated in the Crawford County Detention Center (jail). Jerala Grayson (Appellant), as the personal representative of Grayson's estate, sued the Crawford County Sheriff and three of the jailers in their individual and official capacities. An amended complaint altered the list of defendants, adding arresting officer Michael Sharum, in his individual capacity, and dismissing jailer Roy Bass.

The suit alleged violations of Grayson's right to medical treatment and to due process, as secured by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, redressable under 42 U.S.C. § 1983, as well as violations of rights secured by the Constitution of the State of Arkansas, redressable under the Arkansas Civil Rights Act of 1993. The district court granted summary judgment in favor of the Crawford County Sheriff, finding that the individual capacity claim failed because it was undisputed that the Sheriff was not aware that Grayson was incarcerated until Grayson had already seriously injured himself. Appellant does not appeal this finding.

The district court also granted summary judgment in favor of the Sheriff and the remaining jailers in their official capacities, finding that Appellant's claim for failure to train or for unlawful policy or custom violations failed. The district court ruled that Officer Sharum was entitled to qualified immunity, and granted summary judgment in his favor. Finally, the district court granted qualified immunity to the two remaining jailers, Chris Porter and John McAllister, for the decision to accept Grayson

into the jail (intake), but not for their subsequent actions or the timeliness of summoning medical attention (post-intake monitoring). The case proceeded to a jury trial, resulting in a verdict in favor of Porter and McAllister.

Appellant appeals the grant of qualified immunity to Sharum, the partial grant of qualified immunity to Porter and McAllister, and the grant of summary judgment on the official capacity claims as to the Sheriff, Porter, and McAllister. In addition, Appellant contends that the jury was improperly instructed on the standard of care under the Arkansas Civil Rights Act of 1993. Finally, Appellant questions the district court's exclusion of evidence regarding the Arkansas State Jail Standards. We affirm in part.

## I.    BACKGROUND

At oral argument, Appellant conceded that there was no Fourth Amendment claim; thus, the facts regarding the arrest are merely provided as background. Because the district court granted qualified immunity on the intake procedure, we view those facts in the light most favorable to Appellant, the non-moving party. Robinson v. White County, Ark., 2006 WL 1805978, at *4 (8th Cir. July 3, 2006). The claims for post-intake monitoring proceeded to trial, and we recount the facts in the light most favorable to the jury verdict. Smith v. Ferrel, 852 F.2d 1074, 1076 (8th Cir. 1988).

### A.    The Arrest

On October 15, 2000, a little after 2:00 p.m., Van Buren, Arkansas, Police Officer Michael Sharum responded to an accident report involving a vehicle in a creek. He found Grayson standing next to the creek, soaking wet, and reporting that his vehicle was going to "blow up." Sharum tried to arrest Grayson for driving while intoxicated, and Grayson became combative. Sharum, struggling to gain control of Grayson, struck Grayson on the head with his duty weapon, and then Grayson

-3-

cooperated with the arrest. Sharum placed Grayson in the back of his unit and transported him to the jail.

## B. The Intake

Following the arrest, Sharum drove his vehicle into the sallyport at the jail. He walked with Grayson into the jail and had Grayson sit on a bench in handcuffs. Sharum told the jailers that he was "pretty sure" Grayson was under the influence of some narcotic. Sharum also told the jailers that he would have to come back later to perform a blood draw for a toxicology screening and asked that Grayson be changed into dry clothing. While he was filling out a probable cause sheet, Sharum observed Grayson calmly sitting on the bench, coherently answering questions from the jailers about his name, address, date of birth, and social security number. Sharum also spoke to Grayson's mother, who explained that Grayson had a history of methamphetamine use. Sharum left the jail. At the time of their interactions, Sharum was not sure if Grayson was actually experiencing any hallucinations, such as Grayson's reported belief that his vehicle would "blow up." When Grayson arrived at the jail, he appeared normal, was responsive and attentive, and did not display any signs that he was having hallucinations.

Grayson was brought to the jail at approximately 2:30 p.m., shortly before the first shift ended at 3:00 p.m. Corporal Bobby Josenberger was supervising jailers Roy Bass and Gena Bowles. When Gena Bowles first observed Grayson, he was sitting quietly on a bench in handcuffs. She had a difficult time getting his attention. She asked him if he had been doing drugs, and he replied that he had lost something. Bowles initially refused to accept Grayson, and Sharum complained to her that taking Grayson to the hospital would take a lot of time. Bowles told Josenberger that she thought Grayson should not be booked into the jail, but should be taken to the hospital. Bowles called Grayson's mother, and put his mother on the phone with Josenberger.

After talking to Grayson's mother, Josenberger conferred with Sharum and Corporal John McAllister. Because McAllister would be supervising the next shift starting at 3:00 p.m., McAllister visually evaluated Grayson to determine whether to accept him at the jail. He asked Grayson if he had been doing drugs, and Grayson told McAllister that he had lost his straw. McAllister decided to book him into the jail, stating that the jail had booked detainees in worse condition. Bowles told McAllister that she thought that Grayson would become more intoxicated, but he assured her that Grayson would be all right. McAllister was not informed that Grayson had been struck in the head or that Grayson had claimed his vehicle was going to explode.

Bass, McAllister, and a third jailer accompanied Grayson to the dressing room inside the jail. Grayson complied with their instructions and changed into a dry prison uniform by himself. At approximately 2:55 p.m., Bass, jailer Chris Porter, and McAllister escorted Grayson to Cell 7, which was used as an observation cell for prisoners who were intoxicated, to make sure that a jailer could readily observe him.

### C.    The Post-Intake Monitoring

Jailers Chris Porter and Lacy Ree worked the afternoon shift that day, from 3:00 p.m. to 11:00 p.m., with McAllister supervising. When Grayson entered Cell 7, Porter did not notice anything that caused him concern.

Sharum returned to the jail at 4:30 p.m. to take Grayson's blood. Again, at that time, Sharum observed that Grayson was not acting abnormally and Sharum did not observe evidence that Grayson was hallucinating. Sharum read Grayson his rights on implied consent for drug testing, and Grayson stated that he did not understand, would not submit to testing, and did not want to sign anything. McAllister accompanied Sharum to witness the reading of the implied consent form and noticed that Grayson was acting like he did not want to be disturbed, a not-uncommon

reaction to the implied consent form, but nothing about the event signaled that Grayson needed to go to the hospital.

Porter was stationed at a desk located in a hallway common to all cells, approximately fifteen to twenty feet from Cell 7. Porter checked on all men in the jail at 3:05 p.m. and at 4:00 p.m. and noticed nothing unusual about Grayson. Until 5:00 p.m., Grayson was quiet and behaved normally.

However, at 5:00 p.m., Grayson's behavior changed. He began to scream, a behavior Porter characterized as not unusual for intoxicated inmates. Porter notified McAllister, who responded to Cell 7. McAllister saw Grayson sitting on the floor with his shirt off, screaming and rubbing his eyes with the palms of his hands. McAllister called Grayson by his first name. Grayson stopped and agreed to relax and calm down. McAllister left Cell 7 and instructed Porter to put Grayson on a fifteen-minute watch. McAllister went to the front of the jail and telephoned the jail administrator to let him know that there was an inmate screaming and rubbing his eyes. The administrator told McAllister to keep an eye on the inmate, which McAllister considered already accomplished by the fifteen-minute watch.

At 5:15 p.m, Porter noted that Grayson had taken off his clothes and was still screaming. At 5:23 p.m., Grayson was standing in Cell 7 and sweating. At 5:30 p.m., Porter noticed a small pool of blood on the floor. Grayson was bent over with his back to the door, so Porter contacted McAllister.

Sharum and Van Buren Police Officer Griffin came to the jail at the jailers' request at 5:36 p.m. When Sharum arrived, Grayson was naked and covered in blood and sweat. Sharum, Griffin, Porter, and McAllister entered Cell 7 together and discovered that Grayson had succeeded in mutilating himself and was attempting to harm himself further. McAllister pulled Grayson from Cell 7 into the hallway in a face-down position and tried to restrain Grayson by lying across the back of Grayson's

knees. While on top of Grayson, McAllister radioed Ree to summon an ambulance, the Sheriff, and the jail administrator. Porter immediately tried to grab Grayson's hand to prevent him from harming himself further. A prolonged struggle ensued, in which Sharum's arm was broken, and his shoulder dislocated.

According to the jail logs, an ambulance was called at 5:52 p.m., sheriff's deputies arrived at 5:58 p.m., and the ambulance had arrived and medical technicians were treating Grayson by 6:00 p.m. At 6:09 p.m., Grayson had stopped breathing and at 6:22 p.m., he was transported out of the jail and to the Crawford County Emergency Room. Grayson died of excited delirium as a result of acute methamphetamine intoxication and physical struggle, with idiopathic cardiomyopathy as a contributing condition.

## II.    DISCUSSION

### A.    Qualified Immunity

We review the district court's grant of summary judgment de novo, applying the same standards as the district court. Robinson, 2006 WL 1805978, at *2. Because the district court granted summary judgment based on qualified immunity, we also employ the qualified immunity standard:

> "Government officials who perform discretionary functions are entitled to qualified immunity unless their alleged conduct violated clearly established federal constitutional or statutory rights of which a reasonable person in their positions would have known. We analyze [the] qualified immunity issue in two steps. First, we ask whether the facts as asserted by the plaintiff show the officer's conduct violated a constitutional right. If the answer is no, we grant qualified immunity. If the answer is yes, we go on to determine whether the right was clearly established. The relevant, dispositive inquiry in determining whether a

right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

Id. at *3 (quoting Wright v. Rollette County, 417 F.3d 879, 884 (8th Cir. 2005), cert. denied, 126 S. Ct. 1338 (2006)).

Under the first step of the qualified immunity analysis, determining whether there has been a constitutional violation, the Fourteenth Amendment affords pre-trial detainees at least as much protection as the Eighth Amendment does to convicted prisoners; therefore, we employ the Eighth Amendment's deliberate-indifference standard. Crow v. Montgomery, 403 F.3d 598, 601 (8th Cir. 2005). Thus, Appellant must show, (1) objectively, that the conditions of Grayson's confinement "posed a substantial risk of serious harm" and, (2) subjectively, that the defendants "actually knew of but disregarded, or were deliberately indifferent to, [Grayson's] health or safety." Id. at 602. Under the first prong of the deliberate indifference standard, "an objectively serious medical need or a deprivation of that need . . . must be either obvious to the layperson or supported by medical evidence, like a physician's diagnosis." Aswegan v. Henry, 49 F.3d 461, 464 (8th Cir. 1995).

Under the second step of the qualified immunity analysis, we look to whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Robinson, 2006 WL 1805978, at *2.

-8-

### 1.     Michael Sharum

Appellant conceded any Fourth Amendment claims. However, Appellant contends that Sharum is not entitled to qualified immunity, because he declined to take Grayson to the hospital.

### a.     Violation of a Constitutional Right

First, we consider whether Sharum was deliberately indifferent to an objectively serious medical need to determine whether Sharum violated Grayson's constitutional rights.[1] Turning to step one of the deliberate indifference inquiry, we cannot say that it would be obvious to a layperson that Grayson required immediate medical attention at the time Sharum transported him to the jail, therefore he did not have an "objectively serious medical need." Aswegan, 49 F.3d at 464. Sharum observed Grayson's reactions to his vehicle in the water and used his service weapon to subdue Grayson, but, once arrested, Grayson sat calmly in the back of the patrol car, followed directions, answered questions posed, and remained quiet and seated on a bench inside the jail.

Under step two of the deliberate indifference inquiry, Sharum knew that Grayson was likely under the influence of methamphetamine, but the record reflects Sharum was unsure whether Grayson was hallucinating. Therefore, Sharum did not subjectively know that Grayson required medical attention. Sharum was not deliberately indifferent to Grayson's medical needs, and thus did not violate Grayson's constitutional rights. Sharum is entitled to qualified immunity.

---

[1]Sharum's admittedly callous remark to Bowles about the amount of time involved in taking Grayson to the hospital is not a violation of Grayson's constitutional rights. Even if the remark arguably pressured Bowles to accept Grayson as an inmate, McAllister ultimately made the decision whether to book Grayson and he did not hear the remark.

### b. Clearly Established

Even assuming that Sharum was deliberately indifferent to Grayson's constitutional rights, it would not be clear to a reasonable officer that his conduct was unlawful in the situation he confronted, because Grayson's medical needs were not objectively serious. Grayson had not been diagnosed by a physician, cf. Buckley v. Rogerson,133 F.3d 1125, 1127 (8th Cir. 1998) (involving inmate in prison mental hospital who "was diagnosed and treated for chronic schizophrenia or schizophrenia-like psychosis"), nor did Grayson exhibit symptoms that were obvious to the layperson. Cf. Coleman v. Rahija,114 F.3d 778, 784 (8th Cir. 1997) (discussing symptoms of early labor, including bleeding, which were easily recognizable with external examination). Grayson was initially combative when arrested, but once Sharum subdued him, he was calm both in the patrol car and in the jail. Therefore, Sharum is entitled to qualified immunity based on the intake.

### 2. Chris Porter

Chris Porter was not involved in the decision to accept Grayson at the jail; therefore, he could not have violated Grayson's constitutional rights based on Grayson's intake and is entitled to qualified immunity for the intake.

### 3. John McAllister

### a. Violation of a Constitutional Right

First, we consider whether McAllister was deliberately indifferent to an objectively serious medical need. In determining whether Grayson had an objectively serious medical need, absent a physician's diagnosis, we look to whether it would be obvious to a layperson that Grayson required immediate medical attention. Confronted with a calm, non-combative person sitting on a bench answering

-10-

questions, a layperson would not leap to the conclusion that Grayson needed medical attention, even if he were aware that Grayson had taken methamphetamine.

Under step two of the deliberate indifference inquiry, McAllister was aware that Grayson was likely under the influence of methamphetamine. However, he did not know the amount of methamphetamine taken or the time that it was taken. Nor could he readily determine the degree of Grayson's intoxication, because Grayson would not answer questions about his drug use and, indeed, later refused to consent to a blood draw. Grayson's behavior at the time of the intake did not suggest a high degree of intoxication. Therefore, McAllister did not subjectively know that Grayson required medical attention and was not deliberately indifferent to Grayson's medical need.

### b.    Clearly Established

Even assuming that McAllister's decision to override Bowles' objection to accepting Grayson amounted to a violation of Grayson's constitutional rights, we must also determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Though the Supreme Court has recognized that "deliberate indifference to serious medical needs" violates the proscription against cruel and unusual punishment, Estelle v. Gamble, 429 U.S. 97, 104 (1976), it would not be clear to a reasonable officer that admitting Grayson to the jail was unlawful.

At the time of the intake, Grayson had no obvious injuries. McAllister was unaware that he had been struck in the head or that Grayson had been concerned about exploding vehicles. His answers to questions were normal; he gave his name, address, date of birth, and social security number as requested. When asked about taking drugs, he said that he had lost his straw. He complied with the jailers and changed into a dry uniform without assistance. Again, Grayson had not been diagnosed by a physician, cf. Buckley, 133 F.3d at 1127, nor did Grayson exhibit symptoms that were obvious to a layperson. Cf. Coleman, 114 F.3d at 784. It would not be clear to a

reasonable officer that it would be unlawful to accept into custody a calm, compliant inmate who answered routine questions coherently, but became evasive when asked about drug use. Therefore, McAllister is entitled to qualified immunity based on the intake.

## B. Official Capacity Claims

We review de novo the district court's grant of summary judgment, employing the same standard as the district court. Groves v. Metro. Life Ins. Co., 438 F.3d 872, 874-75 (8th Cir. 2006). Appellant's official capacity claims are tantamount to suing Crawford County. Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by "a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Because Monell specifically rejected liability based solely on respondeat superior, id. at 691, "[a] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." White v. Holmes, 21 F.3d 277, 280 (8th Cir. 1994). Rather, official-capacity liability must be based on deliberate indifference or tacit authorization. Id.

### 1. Failure to Train

Liability for failure to train arises "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1988). Appellant argues that the Crawford County Sheriff failed to train the jailers, but both McAllister and Porter were trained in the Basic Jail Standards Training Course. Appellant has advanced no evidence or case law that this training was deliberately indifferent to Grayson's rights, and we decline to hold Sheriff Ross liable in his official capacity.

## 2. Policy or Custom

Policy or custom official-capacity liability is imposed by 42 U.S.C. § 1983 only for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 690-91. Appellant argues that Crawford County had a custom of booking inmates who were hallucinating and that this custom deprived Grayson of his constitutional rights, pointing to the following evidence: Bowles' initial refusal to book Grayson, McAllister's statement that inmates had been booked who were more intoxicated, and Bowles' and Sharum's references to other inmates who were paranoid, picking at their skin and feeling like they had bugs crawling on them, as a result of methamphetamine use.

Bowles refused to book Grayson because "he just wasn't there," but could not offer a more specific explanation. McAllister's statement that inmates more intoxicated than Grayson had been booked is hardly surprising, considering that Grayson was coherent, compliant and cooperative when he was booked. Finally, having inmates in custody experiencing symptoms of the after-effects of methamphetamine use does not evidence an official practice of booking inmates who were hallucinating without providing medical care. Appellant did not present evidence that these other inmates posed a danger to themselves or were not medically evaluated. Because there were no facts supporting a policy or custom of denying care to inmates' serious medical needs, we affirm the grant of summary judgment on the official capacity claims.

## C.      The Arkansas Civil Rights Act of 1993

At trial, the jury found that Porter and McAllister were not deliberately indifferent to Grayson's constitutional rights. While the instructions[2] are consistent with federal Eighth and Fourteenth Amendment protections for pre-trial detainees, see

---

[2]The jury was instructed as follows:

The Plaintiff claims that the constitutional rights of Daniel Grayson were violated after he was arrested and booked into the Crawford County Detention Facility. You are instructed as a matter of law that Mr. Grayson had the constitutional right to be provided with medical care if there was a known, serious need for medical care.

Your verdict must be for the Plaintiff and against the Defendants if all of the following elements have been proved by a preponderance of the evidence. First, that Daniel Grayson had a serious need for medical treatment; second, that the Defendants were aware of Daniel Grayson's serious need for such medical care; third, that the Defendants, with deliberate indifference, failed to provide the medical care needed; and fourth, that as a direct result, Daniel Grayson was damaged.

If any of the above elements has not been proved by the preponderance of the evidence, then your verdict must be for the Defendants.

A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

Deliberate indifference is established only if there is actual knowledge of a substantial risk that Daniel Grayson required medical treatment and if the Defendants disregarded that risk by intentionally refusing or failing to take reasonable measures to deal with the problem. Mere negligence or inadvertence does not constitute deliberate indifference.

Trial Tr., vol. 3, at 495-96.

-14-

<u>Crow</u>, 403 F.3d at 601, the Arkansas Constitution may require a different standard of care. Though we have previously determined that deliberate indifference applies "under article II, section 9 of the Arkansas Constitution," which prohibits cruel and unusual punishment and thus "essentially mirrors the Eighth Amendment of the United States Constitution," <u>Hufford v. Ross</u>, No. 98-3772, slip op. at 3 (8th Cir. May 26, 1999) (per curiam) (unpublished), we decline to extend the deliberate indifference standard to all claims brought by pre-trial detainees and hereby direct the Clerk of Court to certify the following question to the Supreme Court of Arkansas: Does the conscious indifference standard announced in <u>Shepherd v. Washington County</u>, 962 S.W.2d 779 (Ark. 1998), afford greater protection to pre-trial detainees than the federal deliberate indifference standard?

### D.     The Arkansas State Jail Standards

We review the district court's evidentiary rulings for abuse of discretion. <u>United States v. Bistrup</u>, 449 F.3d 873, 882 (8th Cir. 2006). "Jail standards, although helpful and relevant in some cases, do not represent minimum constitutional standards." <u>Johnson v. Busby</u>, 953 F.2d 349, 351 (8th Cir. 1991) (per curiam). The district court did not abuse its discretion by excluding the Arkansas State Jail Standards.

## III.    CONCLUSION

We affirm the district court's grant of qualified immunity to Sharum, partial grant of qualified immunity to Porter and McAllister, grant of summary judgment on the official-capacity claims, and exclusion of evidence regarding the Arkansas State Jail Standards.

The Clerk of Court is directed to certify the following question to the Supreme Court of Arkansas: Does the conscious indifference standard announced in <u>Shepherd</u>

v. Washington County, 962 S.W.2d 779 (Ark. 1998), afford greater protection to pre-trial detainees than the federal deliberate indifference standard?

———————————————