# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-2507

_____

David Ivey

*Plaintiff - Appellee*

v.

Audrain County, Missouri

*Defendant - Appellant*

Stephanie Hildebrand, individually and in her official capacity as a nurse for the
Audrain County Jail; John Doe, individually and in his official capacity as a guard
for the Audrain County Jail

*Defendants*

Richard White, individually and in official capacity as guard - Audrain County
Jail; Nathanael Atkinson, individually and in official capacity as guard - Audrain
County Jail; Nicholas Jensen, individually and in official capacity as guard -
Audrain County Jail

*Defendants - Appellants*

Advanced Correctional Healthcare, Inc.; M.D. Shawndra Brown-Foote

*Defendants*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Hannibal
_____

Submitted: June 16, 2020
Filed: August 4, 2020
_____

Before LOKEN, ARNOLD, and GRASZ, Circuit Judges.
_____

ARNOLD, Circuit Judge.

After Mark Ivey tragically died while jailed in Audrain County, Missouri, his father, a proper plaintiff under Missouri's wrongful death statute, *see* Mo. Rev. Stat. § 537.080.1(1), sued, as relevant, three jail employees under 42 U.S.C. § 1983, claiming they were deliberately indifferent to Ivey's serious medical needs. He also sued their employer—the county—on the ground that its failure to train the officers caused Ivey's death. The district court denied summary judgment to the employees on the issue of qualified immunity—a decision they now challenge on interlocutory appeal. The district court denied summary judgment to the county as well, and it also appeals. We conclude the jail employees are entitled to qualified immunity but that we lack jurisdiction to resolve the county's appeal. So we reverse and remand.

A police officer arrested Ivey one evening at a convenience store for driving under the influence of drugs and for possessing drugs and drug paraphernalia. As the district court explained, at the time of his arrest Ivey "was acting strangely, had defecated on himself, and was under the influence of heroin, methamphetamine, fentanyl and methadone." He was transported to an emergency room, diagnosed with asthma and drug intoxication, and released that night with a letter from the hospital saying that he was fit for confinement.

-2-

Ivey was booked into the jail shortly after midnight. Working the jail's night shift were guards Richard White, Nathanael Atkinson, and Nicholas Jensen. About three hours after being booked, Ivey vomited in his cell. Atkinson and Jensen cleaned Ivey's cell and took him to the shower so he could wash himself, and Ivey told Jensen that he was "doing all right, just needed some water." About two hours later Ivey vomited in his cell again and defecated on himself. From a video monitor White observed what he described as "seizure-like symptoms" in that Ivey appeared "stiff" and "slid off the bench onto the floor." White instructed Atkinson and Jensen to check on Ivey, and again they cleaned Ivey's cell and took him to the shower. When Jensen asked Ivey if he needed medical attention, he declined. White notified his supervisor, who instructed White to monitor Ivey and ensure that the nurse who would be arriving later that morning examine him.

The nurse examined Ivey that morning, and she knew that Ivey had been diagnosed with asthma and was experiencing drug withdrawal. Her notes report that Ivey complained, as relevant, of vomiting twice and having a loose stool, but she disputes that she knew Ivey had had a seizure-like movement or that he had defecated on himself. White maintains that he told the nurse about these things, but, in any case, Ivey remained in the jail after the nurse's evaluation and was not transported to a hospital.

The next evening Ivey vomited in his cell again, and officers again cleaned his cell and took him to the shower. He ate dinner, and later that evening a qualified mental health professional assessed his condition and noted that he was responsive, had no complaints, and was likely withdrawing from drugs. White, Atkinson, and Jensen later took up their posts on the night shift. At one point Ivey was moved to a different cell without incident, and officers checked on him every hour from around nine o'clock that night until three o'clock the next morning, at which time White noticed that Ivey looked pale and that his chest was not rising and falling. White therefore entered the cell to get a closer look at Ivey, saw that something was wrong,

and immediately called for assistance. Officers performed CPR on Ivey but to no avail; he was pronounced dead at the hospital a short time later. The coroner ruled that Ivey died of "acute asthma exacerbation," though the court pointed out that Ivey's cause of death was disputed because his father had produced evidence suggesting that Ivey's withdrawal from drugs contributed to his death.

Ivey's father maintains that White, Atkinson, and Jensen violated Ivey's constitutional rights because they were deliberately indifferent to Ivey's serious medical needs. He maintains that the officers failed to do "what any reasonable person would have done—call 911." Or, he goes on to say, the officers could have called the nurse, a doctor, or at least spoken to medical personnel at the jail about Ivey's condition, and since they didn't, "medical personnel never knew how desperately ill [Ivey] was." Had the officers informed medical personnel of Ivey's condition on or soon after Ivey exhibited symptoms that first night in jail, the argument goes, Ivey could have been transported to a hospital and treated, in which case he would not have died.

The officers moved for summary judgment on the ground that they were entitled to qualified immunity—a legal doctrine that "shields government officials from liability when their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *See Thiel v. Korte*, 954 F.3d 1125, 1128 (8th Cir. 2020). The district court denied their motion on the ground that genuine issues of material fact remained for a jury to settle. We have jurisdiction to review the denial of a motion for summary judgment that was based on qualified immunity. *See Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).

Prison officials violate the Due Process Clause of the Fourteenth Amendment when they show deliberate indifference to a pretrial detainee's objectively serious medical needs. *See Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020). To succeed on this kind of claim, a plaintiff must demonstrate that a pretrial detainee had

an objectively serious medical need that the defendants knew of and yet deliberately disregarded. *Id.*

In denying qualified immunity, the district court found that Ivey's asthma and drug withdrawal could constitute objectively serious medical needs. It also found that the officers knew that Ivey had asthma because the hospital's letter said Ivey needed an inhaler and because a jail intake questionnaire reported Ivey's asthma. The court noted, moreover, that Ivey's seizure-like movements could have been a severe consequence of drug withdrawal and a serious medical need that should have been addressed. Finally, after noting that a factfinder could find deliberate indifference from the fact that a medical need was obvious, the court determined that a jury here could conclude the officers were deliberately indifferent to Ivey's objectively serious medical needs. The officers challenge these determinations, and for purposes of this appeal we will accept as true the facts that the district court found or likely assumed.

We have said that qualified immunity involves the resolution of two questions—whether a defendant has violated a constitutional or statutory right and, if so, whether that right was clearly established at the time of the defendant's conduct. *See, e.g.*, *Santiago v. Blair*, 707 F.3d 984, 989 (8th Cir. 2013). We have the discretion to decide either question first, *see id.*, and we think this case can be resolved on the second question, namely, whether the officers violated clearly established law. To prevail, Ivey's father has the burden to show that legal authorities establish beyond debate that a constitutional violation has occurred, so that, in responding to Ivey, the officers were plainly incompetent or knowingly violated the law. *See Estate of Walker v. Wallace*, 881 F.3d 1056, 1060–61 (8th Cir. 2018).

The Supreme Court has cautioned courts not to define clearly established law at too high a level of generality. *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam). We have recognized this principle in cases involving deliberate indifference to a pretrial detainee's objectively serious medical needs. *See, e.g.*, *Ryan*

*v. Armstrong*, 850 F.3d 419, 426–27 (8th Cir. 2017); *Barton v. Taber*, 820 F.3d 958, 966 (8th Cir. 2016). The district court here defined the right at issue quite broadly when it said that "it is unlawful to delay medical treatment for a detainee exhibiting obvious signs of medical distress." Assuming the court's statement is true as a general matter, its application to the situation that the officers faced here is unclear because they encountered a detainee who declined medical assistance, and Ivey's father has not shown that the law clearly establishes what officers must do in that situation.

At oral argument Ivey's father identified *McRaven v. Sanders*, 577 F.3d 974 (8th Cir. 2009) as a case that shows the officers violated Ivey's clearly established constitutional rights. There, officers arrested someone who admitted taking several drugs and who exhibited poor coordination, slurred speech, a flushed face, droopy eyelids, and a low pulse, blood pressure, and temperature. Once the arrestee entered a holding cell, he moved only once in five hours, during which time a nurse examined him and concluded, without knowing he had taken drugs, that he was merely sleeping off alcohol. The arrestee died at the end of that five-hour period. *Id.* at 978–79. We denied qualified immunity to jail personnel in that case because they relied on the nurse's opinion that the arrestee need not be hospitalized when they knew that opinion was based on inaccurate information. *Id.* at 981–82.

The situation the officers faced here was materially different. The arrestee in *McRaven* was, as the court described him, "incapacitated" and therefore presumably unable to communicate his needs or express his distress. Ivey, on the other hand, was conscious and able to communicate. In fact, he told the officers that he did not want medical assistance and raised various complaints to the nurse who checked on him. So even assuming the officers knew Ivey had asthma or was withdrawing from drugs, the record shows Ivey affirmatively declined their offers to assist him with those difficulties. Ivey's symptoms were also different from the ones exhibited in *McRaven*. Though vomiting may indicate a serious medical need, we imagine that happens commonly in a jail that houses people charged with driving under the influence. *Cf.*

*Thompson v. King*, 730 F.3d 742, 748 (8th Cir. 2013). As for his having defecated on himself while in jail, we are mindful that he also defecated on himself at the time of arrest, and yet an emergency room still deemed him fit for confinement. Perhaps the most serious symptom Ivey displayed was the "seizure-like" movement, but it's unclear whether Ivey had an actual seizure, something else, or nothing at all; in any event, he indicated to the officers when they asked him if he needed medical assistance that all was well, and it's not beyond debate that the officers violated the constitution when they took him at his word.

In short, we do not think that *McRaven* shows that the officers here violated clearly established law and were thus plainly incompetent or knowing violators of the law. *See Wallace*, 881 F.3d at 1060; *cf. Krout*, 583 F.3d at 569–70. And since Ivey's father offers no other "controlling authority or a robust consensus of cases of persuasive authority" governing the situation the officers faced here, *Lane v. Nading*, 927 F.3d 1018, 1022 (8th Cir. 2019), or convinced us that we are dealing with an "obvious" constitutional violation, *see Kisela*, 138 S. Ct at 1153, we conclude they are entitled to qualified immunity.

The dissenting opinion asserts that the officers are not entitled to summary judgment because there are factual disputes as to whether they failed to give Ivey asthma medicine as prescribed and whether they failed to monitor him properly the night he died. The difficulty with this is that Ivey's father raised neither of these arguments on appeal, a matter that the dissent does not dispute. More than that, we don't think he advanced them in the trial court either. The dissent disagrees, though it concedes that "Ivey's father focused his argument primarily on the jail employees' failure to report the first seizure to medical officials," and offers a number of citations to the complaint and to the summary-judgment papers to show that Ivey's father raised these theories. But those citations are unavailing.

First of all, Ivey's father nowhere asserts a claim based on the officers' failure to provide Ivey asthma medication. He mentions that failure in his summary-judgment papers, but only to undergird his contention that the officers knew of Ivey's objectively serious medical needs but did not report them to medical personnel, a claim we have rejected on qualified-immunity grounds. Second, none of the citations to matters outside the complaint shows that Ivey's father raised a deliberate-indifference claim based on the officers' failure to monitor Ivey on the night he died. Though some vague assertions in the complaint might be taken to mean that Ivey's father did so, he has since cleared away any ambiguity. He explained in his brief on appeal that he "has never asserted that the Defendants did see Mark Ivey have seizure-like movements as he died. Defendants saw Mark Ivey have a seizure a full day before his death. And they said nothing to medical about it. That is the basis for their deliberate indifference." So even if Ivey's father raised such a claim in his complaint—a matter we find debatable—he has abandoned it. Though we may affirm a district court's decision on any ground that the record supports, *see King v. Fletcher*, 319 F.3d 345, 347 (8th Cir. 2003), we usually do so when a party advances that alternative ground, not when we raise the matter sua sponte without giving the appellant a chance to respond.

The principle of party presentation counsels against adopting theories of a plaintiff's case that he does not advance, much less one that he expressly disclaims. As the Supreme Court recently reiterated, judges should "decide only questions presented by the parties." *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Richard Arnold, J., concurring in denial of reh'g en banc)). We decline to reconfigure and reframe the plaintiff's case.

We turn now to the county's appeal from the district court's denial of its motion for summary judgment. In addition to resolving, at this stage, matters relating to qualified immunity, we may also decide pendent claims "inextricably intertwined"

with those matters. *See Manning v. Cotton*, 862 F.3d 663, 671 (8th Cir. 2017). Claims are inextricably intertwined with a properly presented issue when its resolution "necessarily resolves the pendent claims as well." *Id.*

The county maintains that we may resolve its appeal because our conclusion that the officers are entitled to qualified immunity means that the county cannot be liable. That would be correct if we had held that no constitutional violation occurred here. *See Mogard v. City of Milbank*, 932 F.3d 1184, 1192 (8th Cir. 2019). But that is not our holding. We hold only that the officers are immune from suit because they did not violate Ivey's clearly established rights. That does not mean that they did not violate the constitution, *see Webb v. City of Maplewood*, 889 F.3d 483, 487–88 (8th Cir. 2018), which would absolve the county from responsibility for their unconstitutional acts, if any. *See Mogard*, 932 F.3d at 1192. When the determination of the county's liability does not flow ineluctably from a resolution of the qualified-immunity issue, the question of whether it is liable for failing to train its officers is not inextricably intertwined with the matter of qualified immunity. *See Manning*, 862 F.3d at 671. So we lack jurisdiction to decide the county's appeal.

Reversed and remanded.

GRASZ, Circuit Judge, concurring in part and dissenting in part.

The court today concludes the defendant jail employees are entitled to qualified immunity because it believes Ivey's father failed to establish a violation of clearly established law related to his son's death while in custody. But even applying our rigorous "clearly-established" jurisprudence, I believe Ivey's claims should survive summary judgment. Here's why.

"Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a

matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (quoting Fed. R. Civ. P. 56(a)). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Id.* at 657 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). Such an approach is required "even when . . . a court decides only the clearly-established prong of the [qualified immunity] standard." *Id.* The Supreme Court has highlighted "the importance of drawing inferences in favor of the nonmovant" when deciding whether the law was clearly established. *Id.*

Under such an approach, my view of this case differs from the court in a few key ways — ways that impact whether the inaction of the jail officials violated clearly established law.

First, the hospital's fit-for-confinement letter indicated the jail should provide Ivey "2 Puffs" of an albuterol inhaler every four hours as needed to treat his asthma symptoms. Ivey was never provided albuterol while in jail. The jail employees emphasize the "as needed" part of the instruction and ask the court to infer it was not needed here because Ivey never asked for it. But such an inference in favor of the moving party is not proper under Rule 56. To the contrary, the proper inference at this stage is that Ivey should have received albuterol every four hours, or at least been asked if he needed it. Neither occurred. Considering at least one of the causes of Ivey's death was determined to be acute asthma exacerbation, failing to give him prescribed asthma medication seems legally significant. *See Dadd v. Anoka Cty.*, 827 F.3d 749, 757 (8th Cir. 2016) ("When an official denies a person treatment that has been ordered or medication that has been prescribed, constitutional liability may follow."); *Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006) (explaining "the knowing failure to administer prescribed medicine can itself constitute deliberate indifference").

-10-

Second, as the court acknowledges, one of the defendants observed Ivey on the video monitor exhibiting seizure-like symptoms and sliding off his bench on to the floor during his first night at the facility. This was after he had vomited in his cell twice and defecated on himself. Taken in a light most favorable to Ivey, these are obvious signs of medical distress. The court minimizes these facts by claiming "it's unclear whether Ivey had an actual seizure, something else, or nothing at all." *Ante* at 7. But because it is unclear, I believe the proper inference to be drawn for purposes of summary judgment is that Ivey in fact had a seizure. This is important because the parties dispute whether the jail employees told any medical professional — including the jail nurse who saw Ivey the next morning — about the episode. And both the nurse and the jail doctor admitted they may have changed their approach in treating or monitoring Ivey had they known he had a seizure.

Third, the nurse testified that, because of Ivey's withdrawal symptoms, he required "constant observation." This is consistent with the jail policy for detainees at risk of progressing to severe levels of a withdrawal, which directs them to be "kept under constant observation by the medical and correctional staff." According to the nurse, jail employees should have observed Ivey on a video monitor at all times. Yet we know both that before his death Ivey again experienced seizure-like movements, this time for two and half minutes, and that the jail employees failed to respond to this apparent seizure for nearly an hour. There is no evidence the jail employees saw the seizure and ignored it. Thus, assuming the nurse's testimony regarding a policy of constant observation is accurate, we may infer the jail employees violated jail policy by not constantly observing Ivey.[1] This inference supports a conclusion the jail employees were deliberately indifferent.

_____

[1] It is possible the jail employees were observing Ivey and, for some reason, simply missed the seizure. And a jury could conclude that reason was merely negligence as opposed to deliberate indifference. The jury could also choose not to believe the nurse's testimony that Ivey was supposed be under constant monitoring. But I believe those questions are for the jury to decide.

The upshot of these inferences is this: Viewed in a light most favorable to Ivey, the facts demonstrate jail employees ignored medical instructions regarding Ivey's needed asthma medication, failed to report Ivey's first observed seizure to health officials, and either defied medical instruction and jail policy requiring Ivey's observation or observed a second seizure and then failed to respond for nearly an hour. I believe a reasonable jail employee in July of 2016 would know such conduct was constitutionally deficient. *See Dadd*, 827 F.3d at 757 (concluding jail employees "had fair warning about the constitutionality of a failure to provide [prescribed] pain medication"); *Phillips*, 437 F.3d at 796 (holding evidence an inmate was not given the prescribed amount of anti-seizure medicine was enough to create a genuine issue of material fact on the issue of whether jail employees were deliberately indifferent); *Gordon ex. rel Gordon v. Frank*, 454 F.3d 858, 863 (8th Cir. 2006) ("A reasonable officer would know that it is unlawful for officers to delay medical treatment for an inmate with obvious signs of medical distress, especially one who communicates the distress directly to officers.").

According to the court, my conclusion improperly adopts theories neither raised nor endorsed by the plaintiff. Respectfully, I disagree.

It is true Ivey's father focused his argument primarily on the jail employees' failure to report the first seizure to medical officials. However, he repeatedly raised the failure to medicate and monitor Ivey to the district court in the operative complaint, the brief opposing summary judgment, and the evidence presented in support of the same.[2] *See* Second Am. Compl.,¶¶ 21, 35–40, 93, 108, 123, ECF No.

---

[2]The court quotes from Ivey's father's appellate brief to demonstrate what it believes is his abandonment of any claim based on the failure of the jail employees to monitor him. *Ante* at 8. I interpret this quote to mean Ivey's father does not charge jail employees with observing and failing to report the second seizure. It says nothing about the jail employees' failure to monitor him and therefore I see no basis to view it as an abandonment of his claim.

63; Pl.'s Resp. to Defs. Mot. for Summ. J., 8, 9, 11, 15, ECF No. 100. It is no surprise then that the district court recognized Ivey's asthma and withdrawal issues and determined "if plaintiff's evidence is believed, a reasonable correctional officer would have realized that Ivey's constitutional rights were violated when his *collective symptoms* were ignored." Mem. and Order, 7–9, ECF 120 (emphasis added). There is plenty in the record and in the district court's opinion about the medication and second seizure from which we can draw when conducting our qualified immunity analysis. *See King v. Fletcher*, 319 F.3d 345, 347 (8th Cir. 2003) (explaining we may affirm the district court's *denial* of summary judgment "on any basis supported by the record").

Indeed, we should consider all the facts in the record when assessing a claim of deliberate indifference, especially where the defendants argue — contrary to the district court's conclusion — that the alleged failures were mere negligence and thus not actionable. One way to decide whether the guards purported failure to report the seizure was merely a mistake or an act of deliberate indifference is to consider how the guards otherwise handled Ivey's medical needs. A pattern of mistakes and oversights indicates that failure to report was not merely a mistake, but rather the result of deliberate indifference. So even if it would not be proper to view the failure to medicate and constantly observe Ivey as independent acts of deliberate indifference (as the court claims), the facts are nonetheless relevant to the qualified immunity analysis.

For these reasons, I believe Ivey's case should survive the summary judgment stage and a jury should decide whether or not the jail officials were indeed deliberately indifferent to Ivey's serious medical needs. Because the court holds otherwise, I respectfully dissent from that portion of the opinion.[3]

_____

_____

[3]I concur with the court's judgment that we lack jurisdiction to decide the county's appeal.