# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-4016
_____

Donna M. Reece, as personal representative of the Estate of Amos Reece, deceased

*Plaintiff - Appellee*

v.

Officer Hale, individually as an officer of the Gravette Police Dept., Gravette, AR

*Defendant*

Deputy S. Williams, Benton County Jail, Benton County Sheriff's Dept.; Deputy James Smith, Benton County Jail, Benton County Sheriff's Dept.; Sergeant D. McCain, Benton County Jail, Benton County Sheriff's Dept.; Sergeant G. Hobelmann, Benton County Jail, Benton County Sheriff's Dept.

*Defendants - Appellants*

Shawna Stephens, Name changed from Shawna Stephan; Captain Jeremy Guyll; Robert Bersi, Benton County Seriff's Dept.; Sheriff Shawn Holloway, Benton County Sheriff's Dept.

*Defendants*
_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville
_____

Submitted: December 13, 2022
Filed: January 31, 2023
_____

Before SMITH, Chief Judge, ARNOLD and STRAS, Circuit Judges.

_____

ARNOLD, Circuit Judge.

After Amos Reece died while under the supervision of employees at an Arkansas jail, his mother Donna M. Reece, as personal representative of his estate, sued, as relevant here, four jail employees under 42 U.S.C. § 1983, alleging that they were deliberately indifferent to Amos's serious medical needs. When they moved for summary judgment on the ground of qualified immunity, the district court denied their motion. They appeal and we reverse.

Though orders denying summary judgment are generally not immediately appealable because they are not final decisions under 28 U.S.C. § 1291, we have jurisdiction to review them when they are "based on a claim of qualified immunity." *See Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014). We review the district court's order de novo, viewing the evidence in a light most favorable to Donna since she is the non-moving party. *See Thompson v. King*, 730 F.3d 742, 746 (8th Cir. 2013).

Amos was arrested in the middle of the night after he reportedly attempted to break into vehicles in a hospital parking lot. He was transported to and booked into the Benton County Detention Center (BCDC). Over the next few hours his medical condition deteriorated to the point that he was taken to a nearby hospital where he died. According to an autopsy report, "It is likely that Mr. Reece orally consumed a quantity of methamphetamine within a small plastic bag. The bag subsequently opened within the stomach, leading to acute methamphetamine toxicity and his subsequent death." Amos never told anyone at BCDC about the bag.

"Prison officials violate the Due Process Clause of the Fourteenth Amendment when they show deliberate indifference to a pretrial detainee's objectively serious medical needs. To succeed on this kind of claim, a plaintiff must demonstrate that a pretrial detainee had an objectively serious medical need that the defendants knew of and yet deliberately disregarded." *Ivey v. Audrain Cty.*, 968 F.3d 845, 848 (8th Cir. 2020). Even if a plaintiff makes this showing, defendants are entitled to qualified immunity if "their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *See id.* Because liability for damages for a federal constitutional tort is personal, we assess each defendant's conduct individually. *See Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 805–06 (8th Cir. 2010).

We begin with defendant Spencer Williams, who booked Amos into BCDC a few minutes before five o'clock in the morning. According to an incident report that Williams completed, upon arrival at booking, Amos stated that he was very thirsty, but Williams informed him that he had to complete the intake process before Amos could enter the facility. Amos "gave the impression that he understood completely but repeated how thirsty he was multiple times." Williams informed Amos that he needed to sign some forms regarding his property, and Amos "nodded signifying that he understood and signed both sheets and begged me to take him in for a drink of water." After Williams completed the intake process, he escorted Amos to a cell and told him that he could drink from the sink there, and Amos thanked him. Defendant Sergeant Desiree McCain witnessed Amos's booking and noted in her report that "[n]o unusual behavior was observed either in his demeanor or physical well-being." Another deputy present at booking did not note in his report that Amos behaved in an unusual way in Williams's presence.

Williams noted that, when he returned to the intake area, the arresting officer reported that Amos had also told him multiple times during transport to BCDC that he was thirsty and said "that even a puddle of rain water would suffice." The officer

also said that Amos "was acting [as] if he was having a seizure in the back of his cruiser." The parties dispute whether the record shows that the arresting officer also told Williams that Amos was under the influence of methamphetamine, but for purposes of this appeal we will assume that he did. Williams's shift ended a short time later, and he had no other interactions with Amos.

The district court held that "[n]o reasonable juror would find Mr. Reece's behavior during booking would indicate a serious medical need." We agree with this conclusion. We encountered a similar situation in *Grayson v. Ross*, 454 F.3d 802 (8th Cir. 2006). In that case we granted qualified immunity to an intake officer who knew that an arrestee was high on methamphetamine but thought the jail had "booked detainees in worse condition." *Id.* at 807, 810. The arrestee was calm, non-combative, able to sit and answer questions, and had no obvious injuries. Since his behavior didn't exhibit "a high degree of intoxication," a reasonable jury could not infer that the officer was subjectively aware of a serious medical need. *See id.* Considering the similarity in Amos's condition and the arrestee's condition in *Grayson*, we conclude that a jury could not reasonably infer that Williams was subjectively aware of any serious medical need at this time.

For illustrative purposes, we contrast the situation that Williams confronted with situations that other booking officers have faced who did not receive qualified immunity. In *Thompson*, an arrestee passed out in the booking area and nearly fell out of his seat. He was too intoxicated to sign any forms or answer questions. The officer then ignored another detainee's warning that the arrestee needed help. 730 F.3d at 749–50; *see also Barton v. Taber*, 908 F.3d 1119, 1124–25 (8th Cir. 2018). We believe that Amos's behavior before Williams is a far cry from what the booking officers in *Thompson* and *Barton* observed.

The district court nonetheless denied Williams qualified immunity because the arresting officer informed him of Amos's seizure-like activity on the way to BCDC

and yet Williams did nothing about it. The court opined that a layperson would recognize seizure-like activity as a serious medical need that Williams deliberately ignored.

We respectfully disagree with the district court. First, the arresting officer said merely that Amos "was acting [as] if he was having a seizure," perhaps suggesting that Amos was faking a medical event or that the officer was unsure about whether Amos was having a seizure. A reasonable jury could not conclude from this description of events that Williams was aware of a serious medical need. Second, a reasonable officer would not necessarily infer that seizure-like activity in these circumstances required him to take additional action. Amos was behaving normally at booking, though very thirsty and reportedly under the influence of methamphetamine. It isn't unreasonable to believe that whatever medical episode he experienced during transport (if he actually experienced one) had fully resolved itself by the time Williams encountered him. Third, neither the district court nor Donna has provided any authority clearly establishing that an officer in circumstances sufficiently similar to the ones Williams faced was obligated to summon medical assistance or relate to others what he had learned about Amos. And since it was Donna's burden to provide that authority, *see Ivey*, 968 F.3d at 849, we conclude that Williams is entitled to qualified immunity.

We next turn our attention to defendants Sergeant McCain, Sergeant Greg Hobelmann, and Corporal James Smith. After McCain witnessed Amos's booking, she reported that "[a] short while later [Amos's] behavior changed" in that "[h]e became more obnoxious and his demeanor was more off-putting." She also "observed that he was sweating profusely all over his face, head, arms, chest and back" and "began making statements about 'just shoot me now.'" She explained that his remarks "were not of conversational flow" but "were absurd, random and quickly forgotten when a question was asked in reference to a comment he made." McCain maintains that she misplaced a paragraph in her incident report and that these observations were

actually meant to relate what she saw later that morning, but we will nonetheless presume that her report correctly describes the sequence of events.

McCain's report continued by noting that about two hours after Amos was booked into BCDC, he threw his breakfast tray at the cell window a number of times. Amos complied with a deputy's request to stop throwing things and to calm down. About thirty minutes later, however, he threw his tray at the window again and punched the cell wall multiple times. Concerned that Amos might hurt himself, McCain ordered him placed in a restraint chair situated in an area that allowed jail staff to monitor Amos better. McCain summoned Hobelmann who, with the help of four deputies, secured Amos in the chair after a struggle. It was at that point that Hobelmann or McCain or both requested that medical personnel evaluate Amos.

Five minutes after Amos was secured in the restraint chair, a nurse arrived. She measured Amos's vital signs and, according to Hobelmann, reported that Amos had an elevated heart rate and blood pressure, and she instructed staff to continue monitoring Amos and watch for labored breathing. Hobelmann reported the nurse's instructions to McCain. The nurse also provided Amos medication for his blood pressure, which Hobelmann helped administer. Hobelmann instructed staff to give Amos water whenever he requested it so he would stay hydrated.

Amos informed the nurse during her examination that he was under the influence of methamphetamine. Hobelmann noted in his report that, while in the restraint chair, Amos had told him that he had taken methamphetamine a few days earlier. McCain also reported that she asked Amos, while he was in the restraint chair soon after he had taken the nurse-ordered medications, whether he was under the influence of any drugs, and he said, "Ya, that good shit." When McCain asked what he meant, he didn't provide appropriate answers but instead "mumbled something about 'sexy medieval women.'" He also didn't provide an appropriate answer when

she asked if he needed water. She told Amos where she would be if he needed anything.

After Amos had been in the restraint chair for almost an hour, McCain decided that he could be removed because he had calmed down and no longer appeared to pose a danger to himself, and he was able to hold a conversation even though he was still "coming down" from his methamphetamine high. Defendant Smith was called to help move Amos from the chair to a detox cell. Smith did so with the help of deputies, but when they attempted to leave the detox cell, Amos disobeyed their instructions and had to be subdued. Smith noted that during this time Amos displayed a "mixture of emotions all at once (extremely unstableness of I am trying to collect myself, to I am going to die, to I am going to kill everyone, I hear voices. But again it was all of this thought in seconds)." McCain reported that, while in the detox cell, Amos was sweating profusely and "seemed unwell." Two nurses were monitoring him at this time, and they reported that Amos had dilated pupils and was yelling out nonsensically and acting erratically.

After less than an hour in the detox cell, medical staff decided to call an ambulance to transport Amos to a hospital. Deputies and emergency medical personnel entered the detox cell and injected a sedative into Amos. He was then loaded onto a gurney with Smith's help and taken to the ambulance while Hobelmann helped sort out which officers would accompany Amos to the hospital. Amos apparently "coded" once in the ambulance and received chest compressions. He arrived at a hospital a short time later where doctors tried unsuccessfully to resuscitate him.

According to the district court, both Hobelmann and Smith "did nothing" despite observing Amos's bizarre behavior and concerning physical symptoms. We believe the facts just recounted show otherwise. But even if those facts do not show otherwise, the district court's determination overlooks the critical fact that medical

personnel were monitoring Amos by the time Smith first interacted with him and within ten minutes after Hobelmann did, apparently because Hobelmann or McCain or both requested them. "Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to outside doctors or dentists." *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011).

Donna maintains that it would be unreasonable for the defendants to rely on the nurse's assessment of Amos. In support she cites *McRaven v. Sanders*, 577 F.3d 974 (8th Cir. 2009), where we rejected an officer's attempt to rely on a nurse's assessment of an inmate. *See id.* at 981. But *McRaven* is materially distinguishable. In that case an arrestee appeared unwell, and he had moved in his cell only once in five hours. A nurse examined him and concluded that he was just sleeping off alcohol. *See id.* at 978–79. But jail personnel had neglected to tell the nurse what they knew—that the arrestee had taken a cocktail of various drugs—and they therefore knew or should have known that the nurse's evaluation was based on the faulty assumption that the arrestee was merely drunk. So we held that the officer couldn't have reasonably relied on the nurse's assessment of that arrestee. *See id.* at 981; *see also Ivey*, 968 F.3d at 849–50. Unlike *McRaven*, the record here does not show that Hobelmann or Smith withheld information from the nurse or otherwise knew or should have known that her evaluation was based on faulty assumptions.

Donna also maintains that it was unreasonable to rely on the nurse's assessment because Amos was so obviously impaired and the examination was so manifestly incomplete. But we do not believe that the defendants were in a position to question the sufficiency of the nurse's assessment or demand that she obtain more information from Amos so that she could assess him better. In the circumstances, the defendants can't be faulted for presuming that the medical staff best knows the quantity and quality of information needed for assessments. And even though Amos was obviously sick, "recognizing that someone is sick is not the same as knowing that he is receiving

inadequate care from a trained medical professional." *See McGee v. Parsano*, 55 F.4th 563, 575 (7th Cir. 2022). We therefore hold that Hobelmann and Smith are entitled to qualified immunity.

We last consider McCain's entitlement to qualified immunity, which probably presents the closest question given that she was present throughout Amos's detention in BCDC and therefore witnessed his medical condition deteriorate. But for the same reasons that Hobelmann and Smith were entitled to rely on the medical team's assessment and supervision of Amos, it was reasonable for McCain to rely on the medical team as well once they arrived on scene.

There is some question, though, whether she should have contacted medical staff earlier in the morning (assuming that would've helped Amos anyway), but we don't think the record shows that she was deliberately indifferent to a serious medical need. This isn't a situation where officers essentially ignored an injured inmate for hours as he lay motionless and unresponsive, *see Letterman v. Does*, 789 F.3d 856, 864 (8th Cir. 2015), or failed to seek medical attention even though an inmate had "screamed, howled, and banged his head against the door of his cell for some eight hours." *See Ryan v. Armstrong*, 850 F.3d 419, 425–26 (8th Cir. 2017). The incident report reflects that members of the jail staff, including McCain, checked on Amos at least eleven times in the two-and-a-half hours between booking and McCain's decision to place him in a restraint chair. *Cf. Krout v. Goemmer*, 583 F.3d 557, 569 (8th Cir. 2009). Even though Amos's behavior during that time may have been odd, none of the other five nonparty officers who checked on him requested a medical evaluation either. And even though Amos was making absurd, random comments and was "obnoxious" and sweating profusely at this time, that doesn't serve to distinguish him from many others who enter the jail under the influence of alcohol or drugs. *See Thompson*, 730 F.3d at 748. He also had no external injuries, nor was he struggling to breathe, bleeding, vomiting, or choking. *See id.* Up to the point a medical evaluation was requested, moreover, Amos complied with instructions.

Perhaps McCain could have done more. But we cannot consider Donna's claim through the lens of "hindsight's perfect vision," as she must demonstrate more than mere negligence or "ordinary lack of due care for the prisoner's safety" to succeed on her claim. *See Letterman*, 789 F.3d at 862. The record would not support a finding that McCain's failure to act differently was a product of deliberate indifference. She is therefore entitled to qualified immunity.

Reversed and Remanded.

_____